**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| **Midas Green Technologies, LLC**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 6:22-CV-00050-ADA |
| ) | |
| **Rhodium Enterprises, Inc.;** ) | |
| **Rhodium Technologies LLC;** ) | |
| **Rhodium 10MW LLC;** ) | **JURY TRIAL DEMANDED** |
| **Rhodium 2.0 LLC;** ) | |
| **Rhodium 30MW LLC;** ) | |
| **Rhodium Encore LLC;** ) | |
| **Rhodium Renewables LLC;** ) | PUBLIC VERSION |
| **Rhodium Renewables Sub LLC; and** ) | |
| **Rhodium Ready Ventures LLC.** ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**DEFENDANTS' MOTION TO STRIKE OPINIONS OF AND TO EXCLUDE**
**TESTIMONY OF J. DUROSS O'BRYAN**

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I.  Introduction ................................................................................................................1

II. Background ................................................................................................................1

    A.  The Accused Technology. ....................................................................................1

    B.  The Parties. ..........................................................................................................2

    C.  O'Bryan's Report. ...............................................................................................3

III. Legal Standard ..........................................................................................................5

IV. Argument ...................................................................................................................6

    A.  O'Bryan's lost profits analysis is inadmissible. .................................................6

        1.  O'Bryan's lost profits analysis is inadmissible because he has no basis for his assertions about acceptable non-infringing substitutes. ..........6

        2.  O'Bryan's convoyed sales analysis is inadmissible. ...............................11

        3.  O'Bryan's speculation about post-trial damages fails *Daubert*. ............12

    B.  O'Bryan's reasonable royalty analysis is too unreliable to go to the jury. ...........14

        1.  His reasonable royalty analysis is just lost profits in disguise. ..................14

        2.  Serious errors pervade O'Bryan's purported *Georgia-Pacific* analysis. ...................................................................................................18

V.  Conclusion ...............................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Seating Co. v. USSC Grp., Inc.*,
514 F.3d 1262 (Fed. Cir. 2008)................................................................12

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
2013 WL 5958172 (N.D. Cal. Nov. 7, 2013) ...........................................11

*Asatek Danmark A/S v. CMI USA Inc.*,
852 F.3d 1352 (Fed. Cir. 2017)................................................................15

*Daedalus Blue, LLC v. Microstrategy Inc.*,
2023 WL 5598456 (E.D. Va. Aug. 29, 2023)...........................................11

*Daedalus Blue LLC v. SZ DJI Technology Co., Ltd.*,
No. 2022 WL 831619 (W.D. Tex. Feb. 24, 2022)......................................6

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)....................................................................................6

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
567 F.3d 1314 (Fed. Cir. 2009)................................................................12

*Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*,
2023 WL 8534960 (E.D. Tex. Nov. 27, 2023) .........................................14

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp, LLC*,
879 F.3d 1332 (Fed. Cir. 2018).........................................................14, 20

*Holcombe v. United States*,
516 F. Supp. 3d 660 (W.D. Tex. 2021).......................................................9

*IEX Corp. v. Blue Pumpkin Software, Inc.*,
2005 WL 6426934 (E.D. Tex. Dec. 14, 2005).........................................19

*Ill. Tool Works, Inc. v. MOC Prods. Co., Inc.*,
2012 WL 3561984 (S.D. Cal. Aug. 17, 2012) .........................................18

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012)....................................................................14

*Luhn v. Scott*,
2007 WL 9700685 (W.D. Tex. Sept. 28, 2007)..................................18, 20

*Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*,
 2014 WL 530241 (D. Del. Feb. 7, 2014) ...........................................................................19

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
 851 F.3d (Fed. Cir. 2017).......................................................................................................7

*Panduit Corp. v. Stahlin Bros. Fibre Works*,
 575 F.2d 1152 (6th Cir. 1978) ...............................................................................................7

*Siemens Med. Sols. USA, Inc. v. St.-Gobain Ceramics & Plastics, Inc.*,
 637 F.3d 1269 (Fed. Cir. 2011)...............................................................................................6

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
 883 F.2d 1572 (Fed. Cir. 1989)...............................................................................................7

*Summit 6, LLC v. Samsung Elecs. Co.*,
 802 F.3d 1283 (Fed. Cir. 2015)...............................................................................................6

*Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*,
 2001 WL 1602976 (S.D.N.Y. Dec. 14, 2021) ..................................................................9, 18

*Syneron Med. Ltd. v. Invasix, Inc.*,
 2018 WL 4696969 (C.D. Cal. Aug. 27, 2018) , *report & recommendation
 adopted*, 2018 WL 11351325 (C.D.C al. Sept. 28, 2018)....................................................15

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
 778 F.3d 1365 (Fed. Cir. 2015), *vacated on other grounds*, 136 S. Ct. 893
 (2016), *reinstated in relevant part*, 824 F.3d 1344 (Fed. Cir. 2016) .....................................11

*Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC v. Teledyne Techs., Inc.*,
 2013 WL 4806894 (N.D. Ga. Sept. 9, 2013) ..........................................................................9

*Weisgram v. Marly Co.*,
 528 U.S. 440 (2000).................................................................................................................5

Pursuant to Federal Rule of Evidence 702, Defendants (together, "Rhodium") move to strike and exclude the opinions of Midas's damages expert, J. Duross O'Bryan.

## I.     Introduction

O'Bryan's opinions are unreliable and inadmissible:

*First*, the Court should exclude O'Bryan's lost profits opinion. It rests on the false premise that there are no acceptable non-infringing alternatives to the accused products (immersion cooling tank systems used in Bitcoin mining). But O'Bryan disclaims any independent analysis, and the technical expert he relies on failed to analyze the main competing option (air cooling) or the possibility that Rhodium would build its own non-infringing systems. This dooms his analysis. And that's not all. O'Bryan also presents a convoyed sales opinion that applies the wrong legal standard, and ignores contrary evidence. Finally, O'Bryan asserts that *even if a jury found infringement*, Rhodium would flout that ruling for years. Nothing supports this assertion.

*Second*, O'Bryan's reasonable royalty calculation is inadmissible. While O'Bryan dresses his calculation up in the language of *Georgia-Pacific*, his report and deposition testimony make clear that his reasonable royalty analysis is entirely derivative of his lost profits theory. His reasonable royalty analysis is also fatally flawed on its own terms – his analysis of Midas's licensing practices is unreliable, he does not consider whether Midas's system improved on existing technology, and his hypothetical negotiation analysis asks the wrong question. The Court should exclude O'Bryan's opinions and bar his testimony.

## II.     Background

### A.     The Accused Technology.

This is a lawsuit about immersion cooling technology. In an immersion cooling system, electronic devices are submerged in a dielectric fluid, which conducts heat but not electricity. Ex. 3 ¶¶ 52–54. The fluid carries the heat away from the electronic components, then the fluid itself is

cooled by an external source (for example, it is piped from the tank containing the electronic devices to an exterior a "dry cooler" where it is chilled before it is re-circulated). *Id.* Immersion cooling can have many applications, but as relevant here, it is used to cool the computers used to mine Bitcoin. Midas holds U.S. Patent No. 10,405,457, which describes one system of immersion cooling, and alleges that Rhodium infringes Claims 1 and 5.

Immersion cooling is not the only way to cool computers. In most cases, servers are cooled by air – in essence, the computers are placed in an air-conditioned room, and air circulation carries the heat away. Ex. 3 ¶¶ 49–51. Midas agrees that air cooling competes with its immersion-cooling system. Ex. 4 at 82:12–20. Many Bitcoin miners, including Rhodium, use air cooling. Ex. 5 ¶¶ 41.

### B. The Parties.

Midas is in the business of developing and attempting to sell immersion cooling tanks and cooling systems. Midas hopes to sell those systems in "units" of 2.5 megawatts ("MW"). Ex. 1 ¶ 11. Midas's immersion cooling "unit" contains: (1) "[i]mmersion tanks and cooling modules to hold the miners," (2) "[a] tank pump skid or skids, which comprises a heat exchanger, motor pump, and control logic," and (3) "[a] cooler or coolers," to cool the heated fluid. *Id.* Midas's patented technology is embodied in items (1) and (2), which O'Bryan refers to as the "Tank."

Midas entered the immersion cooling business in 2011, and filed the provisional patent application that would become the '457 Patent in 2012. Ex. 6 at 26:5–8; Ex. 1. Midas did not make a sale to a Bitcoin mining customer, however, until 2021. Ex. 7. In that sale, Midas sold 80 units of immersion cooling – 200 MW – to Riot Platforms, Inc. ("Riot") at a substantial discount. Ex. 1 ¶ 37. Midas made a second 200 MW sale in 2023, also to Riot at a discount. *Id.* Midas also made two smaller sales, but O'Bryan did not include these in his analysis. *Id.* ¶¶ 37, 39 n.81.

Rhodium is not in the business of selling immersion cooling tanks or systems. Instead, Rhodium constructs its own cooling systems, which it uses to mine Bitcoin. Ex. 1 ¶ 14. Rhodium

has constructed two devices, the R30 and R70 tanks, that Midas alleges infringe the '457 Patent. The R30 was first used on December 7, 2020, and the R70 was first used on June 18, 2021. Ex. 8 at pp. 6–7. Nevertheless, O'Bryan asserts that Rhodium began infringing on April 1, 2020, the day it was incorporated. Ex. 1 ¶ 32.

Rhodium does not exclusively use immersion cooling. Through its "Jordan HPC" subsidiary, Rhodium also operates an air cooled Bitcoin mine. Ex. 5 ¶ 115. Although O'Bryan did not consider the entity, Jordan often out-performs Rhodium's immersion-cooling facilities. Ex. 5 at Sched. 2 (~85% Jordan margin; ~72% for immersion entities).

**C.    O'Bryan's Report.**

O'Bryan offers two broad categories of opinions: lost profits and reasonable royalty. Ex. 1 ¶ 20. Within his lost profits section, he offers two options: Opinion 1, which includes lost profits on convoyed sales, and Opinion 2, which does not. *Id.* Then, O'Bryan offers a reasonable royalty opinion as "Opinion 3." *Id.* But that's not all. Within each "Opinion," O'Bryan offers two "Scenarios" – "Scenario 1," which calculates damages through the end of 2023, and "Scenario 2," which calculates damages through 2026 (when O'Bryan, as explained below, surmises that Rhodium would stop infringing). *Id.*

**1.    Opinion 1.** For his first opinion, O'Bryan purports to calculate Midas's lost profits on both the patented "Tank" and allegedly convoyed sales by applying the *Panduit* factors.

At the first step, O'Bryan finds demand for the patented product because of Midas's two sales to Riot and because "[b]ut for Defendants' alleged infringement of Plaintiff's patented immersion cooling systems, Defendants would have purchased those systems from Plaintiff as Plaintiff was one of the few immersion cooling system providers in the marketplace." Ex. 1 ¶ 24. For the latter claim, O'Bryan relies entirely on Midas's CEO, Scott Sickmiller, who admitted that he had no data, studies, or other bases for his belief. Ex. 1 ¶ 24 n.46; Ex. 4 at 236:2–24.

At the second step, O'Bryan asserts that there are no acceptable non-infringing substitutes for Midas's patented technology. Ex. 1 ¶ 25. O'Bryan did not form an independent opinion on this topic. Ex. 2 at 108:18–109:14; 114:16–21; 138:23–139:6 ("I'm not carrying water with respect to an acceptable non-infringing substitute."). Instead, he relied on Midas's infringement expert, Dr. Himanshu Pokharna, and conversations with his client. Ex. 2 at 111:8-15; *see also* Ex. 1 ¶ 25.

At the third step, O'Bryan claims that Midas could have met Rhodium's added demand. Again, O'Bryan relies only on his client's private statements. Ex. 1 ¶ 26; Ex. 2 at 140:4–13 (Sickmiller told him "[t]hat they had all the capacity to get that done"). O'Bryan did not, for example, contact any of Midas's vendors to verify his client's claims. Ex. 2 at 231:9–232:5. He also did not analyze whether Midas had capital to meet Rhodium's demand. *Id.* at 148:15–149:5.

Finally, O'Bryan calculates Midas's theoretical profits. O'Bryan's analysis includes all components that Midas sold with its Tanks, most notably the exterior dry coolers. He asserts that these items are properly included as convoyed sales because they are "functionally related to the patented product and constitute a single assembly or system and operate as a functional unit." Ex. 1 ¶ 12; *see also id.* ¶ 35. This is supposedly so because the other components are "pertinent to the patented process," "necessary" to "maximize the benefits achieved by the patents" and "sold together as a package by Midas." *Id.* ¶ 12; *see also id.* ¶ 35.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

    **2.**    **Scenario 2.** O'Bryan's first lost profits opinion also includes his most in-depth explanation of "Scenario 2" – his assertion that damages are proper through 2026. (In subsequent

Opinions, O'Bryan refers to this analysis. *Id.* ¶¶ 51, 117.) O'Bryan's report does not give a basis for his belief that Rhodium would continue to infringe after trial. *Id.* ¶ 33. He testified that he should be allowed to tell the jury that Rhodium will flout their verdict because of his subjective belief that it is "certainly possible" that Rhodium would continue infringing. Ex. 2 at 183:11–186:13. So, he seizes on a 2023 projection that Rhodium would grow to 325 MW, projects that Rhodium would reach that size in 2026, and uses that to calculate future damages. Ex. 1 ¶ 33; Ex. 2 at 186:16–21. O'Bryan disregards that this projection was made in connection with a planned merger that was never completed. Ex. 2 at 192:12–15. ██████████████████████████

██████████████████████. Ex. 1 ¶ 47.

      **3.**     **Opinion 2.** O'Bryan's Opinion 2 is entirely derivative of his Opinion 1, but without convoyed sales. He uses only the "Tank" as his damages base. Ex. 1 ¶¶ 48–58. ██████████████

███████████████████████████████████. *Id.* ¶ 58.

      **4.**     **Opinion 3.** Here, O'Bryan offers a putative reasonable royalty calculation. Relying on Midas's technical expert and counsel, he assumes the Tank is the smallest applicable unit. Ex. 1 ¶ 67. ██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████ *Id.* ████████████

██████████████████████████████████████

███████████████████████████████. *Id.* Then, O'Bryan purports to consider the *Georgia-Pacific* factors to decide which end of the profits range Midas would have preferred. *Id.* ¶¶ 68–111. Unsurprisingly, he picks the high end. *Id.* ¶ 113.

## III.   **Legal Standard**

      "Since *Daubert*. . . parties relying on expert evidence have had notice of the exacting standards of reliability such evidence must meet." *Weisgram v. Marly Co.*, 528 U.S. 440, 455-56

(2000). The proponent must establish[1] that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d); *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1298 (Fed. Cir. 2015) (explaining that Rule 702 requires district courts to ensure that all expert evidence is "based on reliable principles and . . . sufficiently tied to the facts of the case."). As gatekeeper, this Court "ensure[s] that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993).

## IV.    Argument

### A.    O'Bryan's lost profits analysis is inadmissible.

O'Bryan's lost profits analysis cannot reach the jury for at least three reasons. *First*, his opinion requires an absence of acceptable non-infringing substitutes, but O'Bryan has no basis to rule out non-infringing options. *Second*, his convoyed sales analysis turns on the wrong definition of the term; he cannot testify about an analysis that conflicts with the law. *Third*, O'Bryan's assertion that damages are appropriate through 2026 (two years after trial) rests on a single unreliable Rhodium forecast and his subjective speculation that Rhodium might ignore a verdict.

#### 1.    O'Bryan's lost profits analysis is inadmissible because he has no basis for his assertions about acceptable non-infringing substitutes.

"To recover lost profits, the patent owner must show causation in fact, establishing that but for the infringement, he would have made additional profits." *Siemens Med. Sols. USA, Inc. v. St.-*

---

[1] *Daedalus Blue LLC v. SZ DJI Technology Co., Ltd.*, 2022 WL 831619, at 3 (W.D. Tex. Feb. 24, 2022) ("The burden of establishing the admissibility and relevance of the expert testimony is on the party offering the testimony.").

*Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1287 (Fed. Cir. 2011). "A standard way of showing lost profits . . . is for the patent owner to prove '(1) demand for the patented product, (2) absence of acceptable non-infringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made.'" *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1572, 1577 (Fed. Cir. 1989) (adopting *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978)). O'Bryan purports to apply this analysis.

The second *Panduit* factor – the existence or absence of acceptable non-infringing substitutes – tests whether, in a but-for world where Rhodium did not infringe, Midas would have necessarily captured the sales. Without an acceptable substitute, Midas might have won Rhodium's business. But, "if there is a noninfringing alternative which any given infringer would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d at 1286 (Fed. Cir. 2017). O'Bryan concedes this point. Ex. 2 at 73:24–74:7.

O'Bryan cannot reliably establish the second *Panduit* factor. He lacks any basis, much less a reliable one, to rule out air cooling as an "acceptable" non-infringing alternative.

### (a)    O'Bryan cannot rule out air cooling.

**i.**    Liquid immersion is not the only way to cool a Bitcoin mine. Instead, many Bitcoin miners (including Rhodium) utilize "air cooling" – air conditioning – to maintain the temperature of their facilities. Ex. 2 at 106:19–25. It is undisputed that air cooling is not infringing. *Id.* Accordingly, to reliably conclude that lost profits are available, O'Bryan must have a basis to rule out air cooling as an acceptable alternative to Midas's liquid cooling system. *Id.* at 73:24–74:7.

**ii.**    O'Bryan disclaims any independent analysis of whether alternatives are "acceptable" and has no opinion on the acceptability of air cooling. *Id.* at 108:18–109:14 ("I kind of don't even have to get to the 'acceptable' component of it so I really didn't spend any time

looking at 'acceptable' per se."). He simply assumes air cooling is unacceptable. Ex. 1 ¶ 25. For this assumption he cites two sources: (1) Midas's infringement expert, and (2) undisclosed statements from conversations with his client. Ex. 1 ¶ 25; Ex. 2 at 108:18–109:14; 114:16–21. Neither source, however, provides a reliable basis for O'Bryan's assertion, which is unsound.

     **iii.**     O'Bryan relies primarily on the opinion of Dr. Pokharna as primary support for his assertion that air cooling is not an acceptable alternative to Midas's system. Ex 1 ¶ 25. O'Bryan's reliance is misplaced, however, because ***Dr. Pokharna did not examine air cooling at all***.

     At paragraph 150 and Exhibit 4 of his report, Dr. Pokharna analyzes eight potential alternatives to Midas's system, concluding that each is infringing. Then, at paragraph 151, Dr. Pokharna lists eight more alternatives, including air cooling. He explains that he "h[as] been advised" of these options, but "h[as] not been asked to do an infringement analysis." Then, he disclaims ***any*** analysis of these alternatives, reporting instead that "[i]t is [his] understanding ***based on discussions with the Plaintiff*** that the products listed below" – i.e., air cooling – "are not acceptable market substitutes." Dr. Pokharna, therefore, cannot justify ruling out air cooling.

     **iv.**     Nor are Midas' self-serving, off-the-record statements are reliable support. Ex. 1 ¶ 25; Ex. 2 at 108:18–109:14; 114:16–21. This is particularly so because the supposed statements O'Bryan relies on directly contradict Midas witnesses' deposition testimony:

- Midas's CEO and corporate designee, Scott Sickmiller, testified that Midas often finds itself bidding against air cooling companies, and that these companies at times "win[] the business instead of Midas." Ex. 4 at 82:12–84:4. Often, Sickmiller explained, these companies prevail because "[a]ir cooling is less expensive to deploy and simpler." *Id.* In fact, Sickmiller testified, companies at times choose air cooling over Midas *even when* presented with Midas's analysis of the supposed benefits of immersion. *Id.* at 85:25–86:24. Later, Sickmiller estimated that, in the market for which Midas's "technology can be used," immersion holds "less than 10 percent" share, with the rest going to air cooling. *Id.* at 144:2–21.

- Midas's controlling shareholder, Francisco Conti, testified that when selling to bitcoin miners, Midas's "first competitor is the air systems." Ex. 9 at 145:20–146:8.

Conti also testified that, at the time Midas approached Whinstone (which Riot now owns),[2] Whinstone was already "using air" to mine cryptocurrency. *Id.* at 153:1– 6. O'Bryan's report does not address Sickmiller's cited testimony, and he did not even bother to read Conti's deposition. Ex. 1 App'x C. O'Bryan's report also ignores evidence that Rhodium's air-cooled mining is just as if not more profitable than immersion cooling. *Compare* Ex. 5 ¶ 159 & Sched. 2 *with* Ex. 2 at 337:7–21 (a comparison between "Rhodium's immersion-cooled entities" and "the financial performance of Rhodium's air cooled entity" "is not in this report"). And, O'Bryan chose not to read the testimony of Rhodium's 30(b)(6) witness and CEO, who agreed that an "air cooled mining operation [is] a feasible substitute for an immersion cooled mine." Ex. 10 at 246:9–12.

O'Bryan's choice to just take his client's word for it, and his total failure to square his client's self-serving statements with the record, dooms his *Panduit* analysis.[3] "Assumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation are not reasonable." *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2021); *Holcombe v. United States*, 516 F. Supp. 3d 660, 687 (W.D. Tex. 2021) (expert may not "simply pick" the conclusion "that is most advantageous to a party's claim while ignoring other relevant evidence" (cleaned up)); *Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC v. Teledyne Techs., Inc.*, 2013 WL 4806894, at *5 (N.D. Ga. Sept. 9, 2013) (excluding an expert whose "'methodology' essentially consists of a series of *ipse dixit* statements that are based solely on information provided by his clients and do not conform to the evidence in the record"). His

---

[2] Whinstone was Riot's corporate predecessor. O'Bryan testified that he treated Riot and Whinstone as equivalent in his report. Ex. 2 at 279:22–280:22.

[3] O'Bryan admitted that he relied entirely on his client to provide helpful testimony, and did not do "anything to verify that was the only testimony" on the topic; he agreed that he "didn't think it was important to check" for contrary evidence. Ex. 2 at 29:10–30:17.

opinion should be excluded.

**(b)    O'Bryan cannot rule out the possibility that Rhodium would construct its own non-infringing tanks.**

O'Bryan also failed to address that Rhodium could have built its own non-infringing systems. Ex. 2 at 89:2–21. Rhodium built its own systems in reality, so this failure is striking. O'Bryan cannot rule out self-constructed acceptable alternatives; his opinion is inadmissible.

Most importantly, O'Bryan overlooks the fact that the systems Midas sold to Riot – on which his entire lost profits analysis turns – ***do not practice Midas's patent***. The '457 Patent requires "a control facility adapted to coordinate the operation" of the system "as a function of the temperature of the ***dielectric fluid in the tank***." Ex. 11, Claim 1 (emphasis added). Midas's former CEO, Jim Koen, admitted the systems Midas sold to Riot, "the heat sensors are at the cooling towers" – i.e., not in the tank – "measuring the temperature of water, not dielectric." Ex. 6 at 287:21–289:13. Midas has no admissible evidence otherwise.[4] Accordingly, Rhodium could have designed systems ***exactly like*** those Midas sold to Riot without infringing. Midas cannot deny that its own systems are "acceptable" alternatives to its patented technology (as those systems are the basis for its lost profits theory). O'Bryan lacks a reliable basis to conclude that Midas would have captured Rhodium's but-for demand.

O'Bryan also ignores that, without impacting function, Rhodium could have made minor

---

[4] O'Bryan does not independently analyze whether Midas's products practice its patent. In his report, he asserts that Midas's XCI system embodies the patented technology by reference to a single citation to Midas's website. Ex. 1 ¶ 8. And, in his deposition, he explained that his understanding was based on undisclosed December 2023 "conversations with counsel," during which he was told conversation with Dr. James Lee, Midas's purported rebuttal infringement expert. Ex. 2 at 96:20–97:22. There are no references to Dr. Lee in Midas's report, and Dr. Lee's opinion that Midas's products practice its patents is not admissible, as explained in Rhodium's separate motion, and O'Bryan's undisclosed second-hand understanding of that opinion is even less reliable. Because O'Bryan assumes throughout his analysis that Midas practices the patent, this shortcoming renders it additionally unsound.

tweaks to make its system non-infringing. Ex. 3 ¶¶ 183–84. Midas has no admissible evidence otherwise. In deposition, O'Bryan defended his failure to address this possibility by insisting that, in the real world, Rhodium "didn't." Ex. 2 at 90:11–21; *id.* at 92:14–21. But the "lost profits damages analysis requires consideration of steps the infringer could have taken to design around the patent beginning on the first date of infringement," including steps "the infringer could have taken in lieu of infringing." *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2013 WL 5958172 (N.D. Cal. Nov. 7, 2013) (emphasis added). O'Bryan does not, so his analysis fails.

## 2.      O'Bryan's convoyed sales analysis is inadmissible.

In his primary lost profits opinion (Opinion 1), O'Bryan asserts that Midas should recover Midas's convoyed sales on both the patented and non-patented components of its immersion cooling system – for example, pump skids (pumps, pipes, and valves) and dry coolers. Ex. 1 ¶ 35. O'Bryan's analysis fails for two reasons.

**a.**      O'Bryan applies the wrong standard to assess convoyed sales. To recover convoyed sales, a patentee must show that the convoyed, non-patented components have "a functional relationship" to the patented product. *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1375-76 (Fed. Cir. 2015), *vacated on other grounds*, 136 S. Ct. 893 (2016), *reinstated in relevant part*, 824 F.3d 1344, 1346 (Fed. Cir. 2016). To establish this "functional relationship," a plaintiff must show that the convoyed products have "*no independent function*" – i.e, that the *un-patented products* "would not work as well" in other applications "not involving the patented technologies." *Id.* Thus, "the non-patented and patented items must not have separate markets." *Daedalus Blue, LLC v. Microstrategy Inc.*, 2023 WL 5598456, at *5 (E.D. Va. Aug. 29, 2023).

O'Bryan does not apply this standard. Instead, he asserts that convoyed sales are available because the non-patented components "are normally sold with the patented technology," "function together 'as a single unit,'" and because "100% of the components of the cooling system are

11

pertinent to the patented cooling process and necessary to achieve the benefits of the patented technology." *Id.* This analysis focuses on ways that the convoyed products impact the operation of the *patented* product, but *Warsaw* directs that the analysis turns on whether the *convoyed* products have an independent functional use. *See also DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1333 (Fed. Cir. 2009) (items not convoyed sales where they "can be used independently of the" patented device and "are related only by virtue of the business relationship that is created when a customer first buys" a patented product). Likewise, his speculation about consumer preferences does not establish a functional relationship. Ex. 2 at 161:20–25; 163:10–164:4; *see also Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008). O'Bryan's conclusion is therefore unsound, and his opinion is inadmissible.

  **b.**  O'Bryan's convoyed sales analysis is also inadmissible because his report does not consider whether, even if Rhodium had purchased its immersion cooling tanks from Midas, it would have sourced the other components separately. Ex. 1 ¶¶ 35–36. This is not some far-fetched hypothetical – Rhodium bought its own dry coolers, pump skids, and more *in the real world*. Ex. 2 at 160:21–161:14.

  O'Bryan conceded that, even if Rhodium bought Midas tanks, it did not have to buy other components from Midas. Ex. 2 at 161:5–25; 164:10–165:20. But to save his highest damages number, O'Bryan "assume[d]" that Rhodium would have *preferred* to buy the non-patented components of its system from Midas. Ex. 2 at 158:9-160:18; *see also id.* at 161:5–25; 163:10–164:4. He did not cite or consider any evidence from Rhodium supporting this point – and there is none. O'Bryan's *ipse dixit* is not a reliable basis for convoyed sales.

  **3.**  **O'Bryan's speculation about post-trial damages fails *Daubert*.**

  The Court should also exclude O'Bryan's "Scenario 2," in which he hopes to obtain a damages award two-plus years beyond trial. His opinion is baseless.

**a.**    O'Bryan's report does not say why he extended the damage period through 2026, and he could not recall ever previously calculating post-trial damages in a patent case. Ex. 1 ¶ 33; Ex. 2 at 183:3–10. In deposition, he could only say that it was "certainly possible" that Rhodium would disregard a jury's verdict and keep infringing. Ex. 2 at 184:16–25. That is pure speculation.

So too is his testimony that a prior company operated by Rhodium's principals (Immersion Systems) was "on notice . . . that they were infringing and then [Rhodium] continued to use that patent . . . so . . . why would they stop now[?]" Ex. 2 at 183:11–186:13. This is no basis for an expert opinion. What's more, the predicates to O'Bryan's speculation are themselves unreliable. There was no infringement finding against Immersion Systems – Midas voluntarily dismissed the action. *Midas Green Technologies, LLC v. Immersion Systems LLC*, N.D. Tex. Case No. 4:20-cv-00555-O, Dkt. 96. Dr. Pokharna gave no opinion about whether Immersion Systems infringed. O'Bryan relied solely on unspecified "[c]onversations with attorneys and client." Ex. 2 at 303:2–9. These undisclosed, self-serving conversations are not a proper basis for his testimony, particularly because O'Bryan did nothing to verify them (nor did he consider deposition testimony to the contrary). Ex. 12 at 205:8–207:8. O'Bryan's future-lost-profits opinion should be excluded.

**b.**    Even assuming that O'Bryan had a reliable basis to tell a jury that Rhodium will disregard their verdict, his future-lost-profits opinion would *still* be inadmissible. O'Bryan says Rhodium will keep infringing Midas's Asserted Patent until it reaches 325 MW in overall mining capacity. Ex. 1 ¶ 33. He bases this opinion on one document: an S-4 that Rhodium filed in connection with a potential reverse merger. *Id.* & n.61; *see also* Ex. 2 at 187:1–3.

This one prediction made before a potential merger is not a reliable basis for a damages opinion. To begin, the merger ***did not close***. Ex. 2 at 189:1–3. O'Bryan ***did not consider*** this fact:

> Q:    Do you consider whether the cancellation of the SilverSun transaction might have changed Rhodium's plans.

A:      No.

Q:      It wouldn't have?

A:      . . . [A]ll I know is they have that projection. . . . I assumed
        that continued. . . .

Ex. 2 at 192:12–21. It is unreasonable to just assume that plans made in the context of a merger

would hold after the deal fell apart. O'Bryan's opinion is inadmissible.

### B.      O'Bryan's reasonable royalty analysis is too unreliable to go to the jury.

#### 1.      His reasonable royalty analysis is just lost profits in disguise.

"[A] reasonable royalty for the use made of the invention by the infringer," 35 U.S.C.

§ 284, is, at a "fundamental" level, a "different" analysis from the lost profits inquiry, *Entropic

Commc'ns, LLC v. Charter Commc'ns, Inc.*, 2023 WL 8534960, at *3 (E.D. Tex. Nov. 27, 2023).

One way to assess royalty damages is the "hypothetical negotiation" approach, which seeks to

determine "the value of the patented technology to the parties in the marketplace when

infringement began." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 76 (Fed. Cir.

2012). O'Bryan purports to reconstruct the hypothetical negotiation by considering the familiar

fifteen *Georgia-Pacific* factors. *See Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp,

LLC*, 879 F.3d 1332, 1348–49 (Fed. Cir. 2018). In reality, he attempts to smuggle in his lost profits

analysis under another name. It is unreliable and inadmissible.[5]

#### (a)      The royalty analysis is entirely derivative of lost profits.

O'Bryan's reasonable royalty analysis is just his lost-profits opinion in different clothing.

Looking at Midas's sales in the 2020 – 2023 period, O'Bryan calculates that ███████████

████████████████████████████████████████████████████████████████

---

[5] O'Bryan also calculates reasonable royalty damages through 2026 as Opinion 3, Scenario 2. That
calculation is independently inadmissible for the reasons described above. *Supra* IV.A.3.

███████████████████████████████ Ex. 1 ¶ 67. ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

*Id.* With that range pre-determined, O'Bryan then purports to apply the *Georgia-Pacific* factors—but only to decide whether Midas would have charged Rhodium at the low or high end.

O'Bryan's profit-centric analysis is inadmissible. To be sure, lost profits can play a role in the reasonable royalty inquiry. *Asatek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1363 (Fed. Cir. 2017). But those profits cannot be the be-all, end-all. *Id.* If an expert offers "a reasonable royalty damages calculation that is ***mathematically indistinguishable from that of a lost profit calculation***," the opinion is inadmissible. *Syneron Med. Ltd. v. Invasix, Inc.*, 2018 WL 4696969, at *5 (C.D. Cal. Aug. 27, 2018), *report & recommendation adopted*, 2018 WL 11351325 (C.D.C al. Sept. 28, 2018); *see also* Ex. 2 at 349:1–350:3 (testifying that his lost profits and reasonably royalty results are not "materially different"). As *Syneron* explains, "although *Georgia Pacific* sanctions consideration of the licensor's anticipated lost profits in calculating a reasonable royalty, it does not authorize the direct setting of the reasonable royalty in the amount of the licensor's lost profits." *Id.* at *4 ("Otherwise, a patent owner could always sidestep the heightened requirements of proving lost profits by recasting his request . . . .").

O'Bryan's Schedules prove the point. O'Bryan's royalty calculations are in Exhibit 12, which cites Exhibits 7–10. Exhibits 7–10 calculate lost profits based on Midas's two Riot sales. Exhibit 12 cites no other analysis, and does no new work. So: O'Bryan's reasonable royalty calculations are ***entirely derivative*** of lost profits. O'Bryan's testimony confirms that his as much:

> Q:    So your -- your reasonable royalty calculation is basically --
> it's just a calculation of Midas's gross -- the gross profits that
> Midas would have earned had it made the sales?
>
> A:    Yeah. Average gross profits over the life -- over the 2020-to-

2023 range.

Q:    Okay. How is that different from the lost profits analysis?

A:    Well, it's a -- it's just a gross margin. It's not -- it's not including all of the costs, potentially. It's just the gross margin on the tank itself. We went down to the smallest unit . . . which was the tank.

Ex. 2 at 243:7–20; 346:20–347:2 (in royalty, Midas "would capture the gross profit it makes on a tank by megawatt"); 348:10-15 (profits are "the base damages" for royalty analysis); 349:24–350:5 ("The only difference really would be really the damage period, whereas in a damage and lost profits you're taking out over a period of time. . . . In a reasonable royalty you're simply paying a one-time amount."). O'Bryan testified that he reaches "similar number[s]" because his "[r]easonable royalty is a lost gross profit*." Id.* at 351:6–352:5. Further confirming that his royalty is just lost profits, he admitted that changing the negotiation date "would not change our calculation at all" because "if you understand our calculation it's simply based on . . . the tank unit and the gross profit on that tank unit*." Id.* at 241:24–242:17.

O'Bryan cannot save his inadmissible lost profits analysis by calling it a reasonable royalty. His royalty opinion should be excluded too.

**(b)    O'Bryan has no reliable basis to assert that Midas would have known or been able to negotiate for its lost profits.**

Even if reliance on lost profits could be proper, O'Bryan's analysis would *still* be inadmissible. In addition to duplicating the errors that plague his lost profits analysis, O'Bryan assumes a March 31, ***2020*** hypothetical negotiation. Ex. 1 ¶ 67. But he relies on the "average gross profit" that Midas "generated" "from 2020 – ***2023***." *Id*. This phrasing implies that Midas sold immersion tanks before the negotiation, but "Midas hadn't made any sales as of March 31, 2020," and did not make any sales in 2020 or 2022 (or at least not any sales that "rate in [his] analysis"). Ex. 2 at 212:23–25; 294:24–295:1. Instead, O'Bryan's calculation of Midas's profits is based on

16

two sales (in 2021 and 2023) to one customer (Riot). Ex. 1 ¶ 67. Each involved discounts. Ex. 2 at 208:8–10. Thus: O'Bryan's opinion is that Midas would win a royalty equal to undiscounted profits ***from sales it would not make for one and three years respectively, and which it made at a discount***.

O'Bryan does not explain how Midas would have foreseen its future undiscounted profits. Ex. 1 ¶ 67. Instead, during his deposition, O'Bryan claimed that he talked to his client, which supposedly told him that ███████████████████████████████████ ███████████████████████████ Ex. 2 at 246:3–20.[6] But he did nothing to check Midas's off-the-record assessment of its own predictive skills:

> Q:      Okay. Do you know whether Mr. Sickmiller worked for Midas in 2020?
>
> A:      I don't know.
>
> Q:      Okay. But you took his -- take his word for what Midas was thinking as of that date?
>
> A:      I spoke with him specifically about it and that's what he said they were thinking about.
>
> Q:      Okay. And you didn't do anything to -- to verify that his understanding was correct?
>
> A:      Nope.

Ex. 2 at 274:20–275:4; *see also id.* at 273:17–274:19. O'Bryan does not cite any contemporaneous evidence, and said "no" when asked if he saw "any document that supported what [Midas] told you about the profits Midas would have understood it would have earned." Ex. 2 at 247:15–24.

In sum: O'Bryan's opinion is that Midas would have accurately forecasted its profits –

---

[6] Later in his deposition, O'Bryan attempted to supplement his answer with a reference to the Book of Wisdom. Ex. 2 at 246:21–247:14. But he does not rely on the Book of Wisdom in this portion of his report. Ex. 1 ¶ 67.

years in advance and to the dollar – just because Midas told him so. O'Bryan may not launder his client's unsupported *ipse dixit*. *Supply & Bldg. Co.*, 2001 WL 1602976 at \*4; *see also Ill. Tool Works, Inc. v. MOC Prods. Co., Inc.*, 2012 WL 3561984, at \*8 (S.D. Cal. Aug. 17, 2012) (excluding opinion based on "a 'rough estimate' given by" a client executive as not "the type of reliable method based on sufficient facts that *Daubert* envisioned"). His royalty opinion is inadmissible.

### 2. Serious errors pervade O'Bryan's purported *Georgia-Pacific* analysis.

O'Bryan's royalty opinion is also inadmissible due to the following fundamental flaws:

**a.** The first *Georgia-Pacific* factor addresses the plaintiff's prior licensing practices. *Luhn v. Scott*, 2007 WL 9700685, at \*9 (W.D. Tex. Sept. 28, 2007). At this step, O'Bryan considered two Midas licenses – neither of which produced any revenue – as "information that the reasonable royalty range I have calculated is reasonable." Ex. 1 ¶ 73.

However, he ***did not consider*** – or even know about – the offer Midas made to license its technology to ***Riot*** in March 2021. O'Bryan's entire lost profits analysis turns on sales to Riot, *see supra*, but he did not bother to check whether Midas had ever offered a license to its biggest customer. Ex. 2 at 279:22–24. Yet, he admitted that the offer would have impacted his analysis:

> Q:    Okay. And -- and so it's your opinion that this -- this offer, then, does it not bear on your analysis at all?
>
> A:    It does bear. Yeah, it does certainly. All of this.
>
> Q:    Okay. Where is this offer considered in your report?
>
> A:    I didn't -- I don't think I saw this offer until Ms. Saitz talked about it, I think in her report.

Ex. 2 at 283:14–23.

It's no wonder O'Bryan did not consider this offer – it proves his range is unrealistic.[7] ■

---

[7] In fact, Rhodium introduced this offer and response as an exhibit to the deposition of Scott Sickmiller. Ex. 4 at 211:7–214:6. O'Bryan purports to have reviewed Sickmiller's testimony. Ex.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

     **b.**      O'Bryan's analysis fails again at the ninth factor: "the utility and advantages of the patent property over the old modes or devices." Ex. 1 ¶ 95. To address this factor, O'Bryan was required to perform *some* analysis of how Midas's patent improves on existing technology – or at least he needed to rely on someone who had. *Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, 2014 WL 530241, at *5 (D. Del. Feb. 7, 2014) (requiring "evidence concerning the advantages of the specific patents in suit compared to other technology"). O'Bryan does no such thing. He did not independently analyze the value of Midas's technology. And he does not cite anyone else who did (and Midas's technical expert didn't, Ex. 15 at 88:24–90:6). Instead, at the ninth factor, O'Bryan asserts that Midas's technology is an improvement because Midas's product "has been in high demand" and "has been copied by many others." Ex. 1 ¶ 96. O'Bryan's *ipse dixit* claim to high demand does not show that Midas's system improves on air cooling. Likewise, O'Bryan's claim that other companies are infringing Midas's system is unproven, completely unsupported, and speculative. *IEX Corp. v. Blue Pumpkin Software, Inc.*, 2005 WL 6426934, at *4 (E.D. Tex. Dec. 14, 2005) ("Mere recitation of the *Georgia Pacific* factors will not survive a challenge if the methodology is unreliable or if it is unclear what facts or data have been relied upon by the

---

1 at App'x C. It therefore appears that O'Bryan remained willfully blind to contrary evidence – or at least negligently overlooked it. Either way, his failure to address this key evidence proves his opinion unsound.

expert."). O'Bryan's failure to reliably address this factor means his analysis is unsound and inadmissible.

     **c.**     O'Bryan's *Georgia-Pacific* analysis also fails at the last step. Instead of considering the amount that Midas and Rhodium "would have agreed upon (at the time the infringement began)," *Luhn*, 2007 WL 9700685, at *10 (quoting *Georgia-Pacific*, 318 F. Supp. at 1120), he evaluated whether the royalty he had *already determined* (████████) would have unduly affected Rhodium's real-world results. Ex. 1 ¶ 110; *see also* Ex. 2 at 359:11–22. An opinion that, in hindsight, Rhodium could have afforded to pay Midas 4% of the profits it earned simply does not support the notion that in 2020 and with future profits uncertain, Rhodium ████████████ ████████. O'Bryan's report contains no analysis on that point – he does not consider the value of the patented technology; he just asserts that 4% "would be reasonable." Ex. 1 ¶ 110. *Daubert* requires more.

*     *     *

     An expert cannot just run through the *Georgia-Pacific* factors and then present a damages number "plucked . . . out of nowhere." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*. 879 F.3d 1332, 1351 (Fed. Cir. 2018). That is what O'Bryan does – he hypothesizes Midas's royalty, performs a perfunctory, flawed analysis of each factor, and then arrives at a conclusion by fiat. Ex. 2 at 360:20–361:22 ("It's not a numeric thing . . . it's an art. And you just say, okay, is it the lower end, is it the higher end? And in this case we picked the higher end."). His analysis is not sufficiently reliable, and cannot survive.

## V.    Conclusion

     The Court should exclude the testimony of J. Duross O'Bryan.

20

DATED: March 1, 2024

Respectfully submitted,

_/s/Melissa R. Smith_
Melissa R. Smith
Texas Bar No. 24001351
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com
J. Travis Underwood
Texas Bar No. 24102587
**GILLAM & SMITH, LLP**
102 North College Avenue, Suite 800
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
travis@gillamsmithlaw.com

Elizabeth R. Brannen
Kenneth J. Halpern (*Pro Hac Vice*)
Peter J. Brody (*Pro Hac Vice*)
Sarah Rahimi (*Pro Hac Vice*)
**STRIS & MAHER LLP**
777 South Figueroa Street, Suite 3850
Los Angeles, California 90017
Telephone: (213) 995-6800
Facsimile: (213) 216-0299
ebrannen@stris.com
khalpern@stris.com
pbrody@stris.com
srahimi@stris.com

***Attorneys for Rhodium Defendants***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been sent to all counsel of record via electronic mail on March 1, 2024.

*/s/ Melissa R. Smith*

**CERTIFICATE OF CONFERENCE**

Counsel for Defendants met and conferred with counsel for Plaintiff about the relief sought in this Motion. Counsel for Plaintiff informed counsel for Defendants that Plaintiff opposes the relief sought in this Motion.

*/s/ Melissa R. Smith*