—1—

<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                          WACO DIVISION

 3    MIDAS GREEN TECHNOLOGIES,
        LLC                      *
 4                               *   April 9, 2024
      VS.                        *
 5                               * CIVIL ACTION NO. 6:22-CV-50
      RHODIUM ENTERPRISES,       *
 6      INC., ET AL.             *

 7            BEFORE THE HONORABLE ALAN D ALBRIGHT
                 PRETRIAL HEARING (via Zoom)
 8
      APPEARANCES:
 9
      For the Plaintiff:   William J. Kolegraff, Esq.
10                         Joseph E. Thomas, Esq.
                           Grant J. Thomas, Esq.
11                         Thomas Whitelaw & Kolegraff LLP
                           18101 Von Karman Ave., Suite 230
12                         Irvine, CA 92612

13    For the Defendant:   Elizabeth Rogers Brannen, Esq.
                           Peter Jacob Brody, Esq.
14                         Sarah Rahimi, Esq.
                           Stris & Maher LLP
15                         777 South Figueroa Street, Ste 3850
                           Los Angeles, CA 90017
16
                           Melissa Richards Smith, Esq.
17                         Gillam and Smith, LLP
                           303 South Washington Avenue
18                         Marshall, TX 75670

19                         James Travis Underwood, Esq.
                           Gillam & Smith
20                         102 N. College, Suite 800
                           Tyler, TX 75702
21
      Court Reporter:      Kristie M. Davis, CRR, RMR
22                         PO Box 20994
                           Waco, Texas 76702-0994
23                         (254) 340-6114

24        Proceedings recorded by mechanical stenography,

25    transcript produced by computer-aided transcription.
</pre>

2

09:33  1                    (Hearing begins.)

09:33  2                    DEPUTY CLERK:  A civil action in Case

09:33  3    6:22-CV-50, Midas Green Technologies, LLC versus

09:33  4    Rhodium Enterprises, Incorporated, et al.  Case called

09:33  5    for a pretrial conference.

09:33  6                    THE COURT:  If I could have announcements

09:33  7    from counsel, please.

09:33  8                    MR. SMITH:  Your Honor, for plaintiff

09:33  9    Midas Green, Michael Smith.  And with me today are

09:33 10    Mr. Joe Thomas, Mr. Bill Kolegraff, and Mr. Grant

09:33 11    Thomas; and we're ready to proceed.

09:33 12                    MR. UNDERWOOD:  Good morning, Your Honor.

09:33 13    Travis Underwood on behalf of the Rhodium defendants.

09:33 14    With me is my law partner Melissa Smith.  We also have

09:33 15    from the Stris & Maher firm our lead counsel, Liz

09:33 16    Brannen, along with two other members from her firm,

09:33 17    Peter Brody and Sarah Rahimi; and we're ready to

09:33 18    proceed.

09:34 19                    THE COURT:  With this group, I feel like

09:34 20    I'm an honorary Eastern District of Texas judge.  What

09:34 21    an honor.  If I could have only been picked to serve

09:34 22    there.

09:34 23                    I will take up first the motion to

09:34 24    correct inventorship.  And I'll hear argument on that,

09:34 25    please.

09:34  1              Mr. Thomas, I think that's you, or

09:34  2  Mr. Kolegraff.  Okay.

09:34  3              MR. KOLEGRAFF:  Good morning.  This is

09:34  4  William Kolegraff.

09:34  5              THE COURT:  Good morning to you, sir.

09:34  6              MR. KOLEGRAFF:  Yes.  So this patent was

09:34  7  originally issued with seven named inventors.  However,

09:34  8  during the process of preparing for this case for

09:34  9  trial, we discovered that six of the inventors should

09:34 10  not have been named.  We provided a correction of

09:35 11  inventorship document, which was sent to the Patent and

09:35 12  Trademark Office about a year ago.  We're still waiting

09:35 13  to hear back from them.

09:35 14              So what we did is, in an abundance of

09:35 15  caution, just in case we don't get this resolved by the

09:35 16  PTO by the time trial starts, we've asked the Court to

09:35 17  order the director of the office to correct the

09:35 18  inventorship.  So right here, we believe we've met our

09:35 19  burden for clear and convincing evidence.  Every one of

09:35 20  the --

09:35 21              THE COURT:  Does that mean I get to tell

09:35 22  Kathi Vidal what to do, or is it someone else?

09:35 23              MR. KOLEGRAFF:  Yes.  You do.  I could

09:35 24  help draft that order for you.

09:35 25              (Laughter.)

4

09:35 1             MR. KOLEGRAFF:  But we do believe we've

09:35 2  met the burden for clear and convincing evidence.

09:35 3  First of all, the package that we have duplicated for

09:35 4  you in the filing is the exact package that we

09:35 5  submitted to the Patent and Trademark Office, which

09:35 6  meets all the statutory requirements.  All the six

09:35 7  inventors that are being removed have signed

09:35 8  declarations that they agree that they should be

09:35 9  removed from the patent.

09:35 10             The remaining inventor, Christopher Boyd,

09:36 11  has agreed that he is the sole inventor.  And Midas

09:36 12  Technology, the assignee of all the rights in interest

09:36 13  in the patent, has also agreed to this change.  So we

09:36 14  don't see any reason why this can't be allowed because

09:36 15  there's clear and convincing evidence to remove these

09:36 16  inventors.

09:36 17             Now, Rhodium does try to muddy the water

09:36 18  and they bring up the names of two other people that

09:36 19  they say may be inventors, Rainone and Christian Best.

09:36 20  That really is irrelevant to this particular motion.

09:36 21             This motion is merely to remove six named

09:36 22  inventors that were wrongly named on the patent, and if

09:36 23  they believe others should be added, then they can take

09:36 24  that up at a separate -- separate matter.  And just as

09:36 25  a point of interest, they don't have any standing to do

| | | |
|---|---|---|
| 09:36 | 1 | this anyway because they don't represent Rainone or |
| 09:36 | 2 | Christian Best, as far as we know. |
| 09:36 | 3 | THE COURT: Okay. Response? |
| 09:36 | 4 | MS. BRANNEN: Good morning, Your Honor. |
| 09:36 | 5 | Elizabeth Brannen from Stris & Maher on behalf of the |
| 09:37 | 6 | Rhodium defendants. |
| 09:37 | 7 | I guess we really should have briefed the |
| 09:37 | 8 | point about Ms. Vidal, who -- Director Vidal, who I |
| 09:37 | 9 | remember fondly as Kathi Kelly Lutton, but the reason |
| 09:37 | 10 | we think this Court should not tell her agency what to |
| 09:37 | 11 | do: |
| 09:37 | 12 | First of all, I think they say in their |
| 09:37 | 13 | reply, they expect the agency to rule soon anyway. So |
| 09:37 | 14 | there is the chance that we can just see what the |
| 09:37 | 15 | Patent Office does. But the reason I would ask the |
| 09:37 | 16 | Court to deny the motion is that the correct |
| 09:37 | 17 | inventorship is a disputed issue in our litigation. |
| 09:37 | 18 | We do contend that there are two omitted |
| 09:37 | 19 | inventors, who they're not even trying to add. And we |
| 09:37 | 20 | don't think the record that they've submitted to this |
| 09:37 | 21 | Court even tries to meet their clear and convincing |
| 09:37 | 22 | burden to prove that all six of the guys they say |
| 09:37 | 23 | should come off actually didn't contribute. |
| 09:37 | 24 | You know, two of them, and we've cited |
| 09:37 | 25 | examples in our brief, testified that they contributed |

| | | |
|---|---|---|
| 09:37 | 1 | to conception of one or more aspects of the claimed |
| 09:38 | 2 | invention.  So I don't -- if you grant the motion, we |
| 09:38 | 3 | don't believe you'd be correcting anything.  We just |
| 09:38 | 4 | don't think they met their burden.  And at this point, |
| 09:38 | 5 | it may be best to see what the agency does. |
| 09:38 | 6 | THE COURT:  Anything else from the |
| 09:38 | 7 | plaintiffs? |
| 09:38 | 8 | MR. KOLEGRAFF:  Yeah.  Just on the issue |
| 09:38 | 9 | of disputes of inventorship, there is no dispute on the |
| 09:38 | 10 | removal of these six.  Those six, all six, have agreed |
| 09:38 | 11 | to do this.  All six have testified that they're not |
| 09:38 | 12 | inventors.  All six have testified that they are |
| 09:38 | 13 | comfortable with, and believe it's correct, that |
| 09:38 | 14 | Christopher Boyd is the sole inventor. |
| 09:38 | 15 | That's all, Your Honor. |
| 09:38 | 16 | THE COURT:  Anything else? |
| 09:38 | 17 | MS. BRANNEN:  Your Honor, in our brief, |
| 09:38 | 18 | we cited testimony from two of them to the effect that |
| 09:38 | 19 | they contributed to conception, and so that would not |
| 09:38 | 20 | make it proper to remove them.  We don't think they've |
| 09:38 | 21 | met the clear and convincing burden. |
| 09:38 | 22 | THE COURT:  Okay.  I'll be back in a |
| 09:38 | 23 | second. |
| 09:38 | 24 | (Pause in proceedings.) |
| 09:43 | 25 | THE COURT:  Okay.  I'm going to grant the |

09:43   1   dismissal of the six; but with regard to the additional

09:43   2   two, I'm not sure -- I'll hear from defendant.  I'm not

09:43   3   sure, procedurally, that issue is in front of me.  I

09:43   4   don't think you're raising it in a response to a motion

09:43   5   properly put in front of me.

09:44   6               I'm really asking you.  Is that wrong?

09:44   7   I'm thinking if it were, like, in a pleading or

09:44   8   something, it would be in front of me, or it's an issue

09:44   9   that the Patent Office should take up.

09:44   10             MS. BRANNEN:  Good morning, Your Honor.

09:44   11   I think we would agree that doesn't -- the point I was

09:44   12   trying to make on this motion is, it wouldn't, from our

09:44   13   perspective, be a correction.  So we were hoping the

09:44   14   Court would deny this motion on that basis.  But I

09:44   15   think we can present evidence to the jury about whether

09:44   16   the patent is invalid for failure to list those two

09:44   17   individuals who we believe should be listed, who

09:44   18   they're not even asking you to add.

09:44   19             THE COURT:  And have you raised that

09:44   20   issue formally in the case?

09:44   21             MS. BRANNEN:  We have, Your Honor.

09:44   22             THE COURT:  Okay.  Okay.  Well, then

09:44   23   we'll take that up at trial.

09:44   24             Next up, I have -- give me one second --

09:44   25   the motion to exclude rebuttal report and testimony of

8

| | | |
|---|---|---|
| 09:44 | 1 | Dr. Alfonso Ortega. |
| 09:45 | 2 | And for the record, I have:  Paragraphs |
| 09:45 | 3 | 91, 92, 133 through 146, 178, 184, 189 and 90, 213, |
| 09:45 | 4 | 222, 239 and 277. |
| 09:45 | 5 | I'll hear argument on that, please. |
| 09:45 | 6 | MR. THOMAS:  Good morning, Your Honor. |
| 09:45 | 7 | Joseph Thomas on behalf of the plaintiff Midas Green |
| 09:45 | 8 | Technology. |
| 09:45 | 9 | Your Honor, this is a case that is, in my |
| 09:45 | 10 | 40 years of practice, I've never seen.  A law firm |
| 09:45 | 11 | directly engage a party who was supporting an expert |
| 09:45 | 12 | and use the privilege to shield from discovery all |
| 09:45 | 13 | communications, all test data, all test parameters, and |
| 09:45 | 14 | produce nothing but a simple result file, which is what |
| 09:46 | 15 | happened here today -- or happened in this case. |
| 09:46 | 16 | We think the law's very clear under |
| 09:46 | 17 | Rule 26 that anything the expert relies upon must be |
| 09:46 | 18 | produced in a case, and had Mr. Ortega functioned, as |
| 09:46 | 19 | the defendants claim, as his support staffer -- is the |
| 09:46 | 20 | term that they've used -- all of this would have been |
| 09:46 | 21 | discoverable, none of this would have been hidden from |
| 09:46 | 22 | us. |
| 09:46 | 23 | And as it stands, the only thing we have |
| 09:46 | 24 | access to is a simple result file that, of course, |
| 09:46 | 25 | shows a result that Dr. Ortega likes and counsel for |

| | | |
|---|---|---|
| 09:46 | 1 | Rhodium likes, but none of the underlying test |
| 09:46 | 2 | parameters, test conditions, test failures, the |
| 09:46 | 3 | convergence data has been produced.  And this kind |
| 09:46 | 4 | of -- I guess it's almost a policy argument, I mean, |
| 09:46 | 5 | whether the Court would sanction and allow lawyers |
| 09:46 | 6 | to -- |
| 09:46 | 7 | THE COURT:  I got it.  I got it. |
| 09:47 | 8 | Is there anything else you need to add? |
| 09:47 | 9 | MR. THOMAS:  No, Your Honor.  We briefed |
| 09:47 | 10 | this and it seems like you've read it.  I would just |
| 09:47 | 11 | point out, we think the Cellular Communications |
| 09:47 | 12 | Equipment case is really on point here, and this report |
| 09:47 | 13 | should be excluded. |
| 09:47 | 14 | THE COURT:  The portion -- the paragraphs |
| 09:47 | 15 | I just read out should be excluded, right? |
| 09:47 | 16 | MR. THOMAS:  Well, we think the -- |
| 09:47 | 17 | there's a basis to exclude the entire report.  We've |
| 09:47 | 18 | also, alternatively, cited specifically paragraphs that |
| 09:47 | 19 | rely on and use in reference to this CFD report.  I can |
| 09:47 | 20 | recite those for you if you want, Your Honor.  They're |
| 09:47 | 21 | in our moving papers. |
| 09:47 | 22 | THE COURT:  No.  I -- okay. |
| 09:47 | 23 | I'll hear a response. |
| 09:47 | 24 | MS. BRANNEN:  Good morning, Your Honor. |
| 09:47 | 25 | We think that the criticisms are wrong on |

09:47  1    the facts about what happened, and also about the law.

09:47  2    So Dr. Ortega, to start with, opines that limitations

09:48  3    of the patent claims are missing and this motion, as I

09:48  4    think the Court has observed, only affects one

09:48  5    limitation, the plenum limitation.

09:48  6                    And what Dr. Ortega did for that

09:48  7    limitation, it requires a plenum at the bottom of the

09:48  8    tank; and that has to be adapted to dispense the

09:48  9    dielectric fluid in the tank substantially uniformly

09:48  10   upwardly through each appliance slot.

09:48  11                   The first thing that Dr. Ortega did was

09:48  12   to look at the design of the tank, the thing they're

09:48  13   pointing to is the plenum.  One part of it has a bunch

09:48  14   of holes in it and it's designed to send the fluid

09:48  15   where things are hottest and need to be cooled the

09:48  16   most.

09:48  17                   And he used his expertise to say this --

09:48  18   you know, this doesn't go substantially uniformly

09:48  19   upwardly.  He reached that conclusion separately on the

09:48  20   plenum limitation.

09:48  21                   Then he used data from the CFD analysis

09:48  22   that they challenge.  Now, whether they're right, that

09:49  23   the -- his graduate student, who he trained how to do

09:49  24   CFD -- whether they're right, that that was an

09:49  25   independent expert, nontestifying expert, or whether

—11—

| | | |
|---|---|---|
| 09:49 | 1 | we're right, that that was his support staff, his |
| 09:49 | 2 | graduate student, the standard for what we had to do |
| 09:49 | 3 | was the same.  Any of the data that Dr. Ortega relied |
| 09:49 | 4 | upon, reviewed and relied upon, we had to produce to |
| 09:49 | 5 | them.  And we did that. |
| 09:49 | 6 | And their motion says we didn't give CAD |
| 09:49 | 7 | files, for example.  That's flatly wrong.  We can look |
| 09:49 | 8 | at their own expert's report at Paragraphs 132 and 52, |
| 09:49 | 9 | and he cites those CAD files because we produced them |
| 09:49 | 10 | in November. |
| 09:49 | 11 | They're also -- they also try to say that |
| 09:49 | 12 | there was cherry-picking.  No.  Dr. Ortega said, |
| 09:49 | 13 | here's -- that's a very large set of data.  I want to |
| 09:49 | 14 | see the part that's right -- you know, he chose the |
| 09:49 | 15 | place he wanted to see it based on the claim language, |
| 09:49 | 16 | which requires the fluid to be going substantially |
| 09:50 | 17 | uniformly upwardly through the appliance slot. |
| 09:50 | 18 | That data that he relied upon, we have |
| 09:50 | 19 | produced to them.  They never asked for additional data |
| 09:50 | 20 | from us in discovery.  They never used this Court's |
| 09:50 | 21 | robust and efficient discovery dispute processes to say |
| 09:50 | 22 | we should have given them anything more. |
| 09:50 | 23 | And they're just wrong that |
| 09:50 | 24 | communications with support staff or nontestifying |
| 09:50 | 25 | experts get produced under Rule 26.  They don't.  The |

—12—

09:50  1   thing that gets produced is what we have produced, what

09:50  2   the expert relied upon.

09:50  3             There is a case in response to the

09:50  4   argument they make in reply that I would like to call

09:50  5   the Court's attention to where the fact pattern is very

09:50  6   similar and the expert who was undisclosed was found to

09:50  7   be -- there was no exclusion of the testifying expert's

09:50  8   report.  That is National Wildlife Insurance Company

09:50  9   versus Western National Life Insurance Company.  It's a

09:51  10  2011 case, 2011 Westlaw 840976, from the Western

09:51  11  District of Texas on March 3rd of 2011.

09:51  12            And there is also a major goose/gander

09:51  13  violation going on here, because we haven't had a

09:51  14  privilege log or the production of any communications

09:51  15  with the support staff of any of Midas Green's experts.

09:51  16            They want to have their Dr. Lee testify

09:51  17  about claim charts that he admittedly did not prepare.

09:51  18  They want to have their damages expert Mr. O'Bryan be

09:51  19  able to rely on hearsay from his subordinates.

09:51  20            So with everything going on, there's

09:51  21  certainly no basis, no authority whatsoever, for

09:51  22  excluding the entirety of Dr. Ortega's opinions.  But

09:51  23  even his opinions about the CFD that they're

09:51  24  challenging, there is no basis to exclude those, not

09:51  25  under the facts of what actually happened and not under

13

09:52  1   the law of what Rule 26 protects from discovery and
09:52  2   what it allows to be discoverable.
09:52  3                   THE COURT:  I'll be back in just a
09:52  4   second.
09:52  5                   (Pause in proceedings.)
09:52  6                   THE COURT:  The Court is going to grant
09:52  7   the motion with respect to those paragraphs.
09:52  8                   With respect to the issues that counsel
09:52  9   brought up at the end under the goose/gander standard,
09:52 10   if you have issues with what they've done, I'll
09:53 11   certainly entertain those separately.
09:53 12                   Next I have the motion to exclude
09:53 13   Dr. Pokharna.
09:53 14                   MS. BRANNEN:  Good morning, Your Honor.
09:53 15                   We are asking to control aspects of
09:53 16   Dr. Pokharna's expert report that we learned about for
09:53 17   the first time in the -- in his report itself that were
09:53 18   not in the final infringement contentions and also to
09:53 19   exclude his opinion about a system at the Temple
09:53 20   facility of my client that is admittedly inoperable
09:53 21   because they ran out of money and they never actually
09:53 22   finished installing what is accused.  And so we think
09:53 23   it would not be -- it's just unreliable to convene a
09:53 24   jury, and there's no fact issue over that.
09:53 25                   So to start with the new opinions that

—14—

| | | |
|---|---|---|
| 09:53 | 1 | were undisclosed, we set those forth in our brief, but |
| 09:54 | 2 | I would point out, Your Honor, this is a case where |
| 09:54 | 3 | they didn't even tell us they were planning to amend |
| 09:54 | 4 | the contentions.  They didn't move to amend earlier, |
| 09:54 | 5 | give us any warning. |
| 09:54 | 6 | And so the prejudice that we are |
| 09:54 | 7 | complaining about is that if we had known that these |
| 09:54 | 8 | theories might be something Dr. Pokharna would present, |
| 09:54 | 9 | we would have had the ability to take fact discovery |
| 09:54 | 10 | and conduct our fact discovery with that in mind. |
| 09:54 | 11 | And it's not a simple case of just |
| 09:54 | 12 | getting to depose Dr. Pokharna again for an hour. |
| 09:54 | 13 | There are seven named inventors, six of whom are coming |
| 09:54 | 14 | off.  There were two -- there was a corporate witness |
| 09:54 | 15 | for Midas Green and another witness for Midas Green |
| 09:54 | 16 | about their systems.  There were many Rhodium |
| 09:54 | 17 | witnesses. |
| 09:54 | 18 | It's just really unfair, and it shows a |
| 09:54 | 19 | disrespect for the rules to have not even alerted us |
| 09:54 | 20 | that they wanted to amend the final infringement |
| 09:54 | 21 | contentions and to disclose these theories for the |
| 09:54 | 22 | first time there. |
| 09:54 | 23 | With regard to the systems that are |
| 09:55 | 24 | inoperable, that's just silly to have a trial about |
| 09:55 | 25 | that.  There's no fact dispute over that, and it would |

09:55   1   be a waste of judicial and party resources to do it.

09:55   2                  So we would ask that that not -- you

09:55   3   know, the system was over two years ago.  Our client

09:55   4   concededly ran out of money, never installed it.

09:55   5                  Their expert has conceded it cannot

09:55   6   measure temperature.  It's not wired in.  There's just

09:55   7   nothing to present to the jury.

09:55   8                  And it would be unreliable for

09:55   9   Dr. Pokharna to opine that systems in that state

09:55  10   practice any of the limitations.

09:55  11                  THE COURT:  A response?

09:55  12                  MR. KOLEGRAFF:  Yes.  This is William

09:55  13   Kolegraff.

09:55  14                  First of all, there's absolutely no --

09:55  15   nothing was hidden here from them.  There's nothing new

09:55  16   that was put in Dr. Pokharna's report.  For example,

09:55  17   this whole idea that Prime Controls, they were

09:55  18   surprised about, is, well, just very surprising.

09:56  19                  Because on March 15th, 2023, we fully set

09:56  20   out to them in a supplement to Interrog 4 (sic), which

09:56  21   is Exhibit D here, the exact way that the Prime

09:56  22   Controls was set up and that Prime Controls was going

09:56  23   to be the infringing set of devices.

09:56  24                  In response to our having done that

09:56  25   supplement to Rog 10, they came back in their

09:56  1   Supplement Rog 1 and said:  As a result of the system

09:56  2   described in plaintiff's supplemental response to

09:56  3   Interrogatory No. 10 and accused in plaintiff's final

09:56  4   infringement contentions...

09:56  5            They admitted that what was in the final

09:56  6   infringement contentions were these Prime Control

09:56  7   devices.  So there's absolutely no surprise here.

09:56  8            Also, this actually is in the

09:56  9   contentions.  We don't say the name "Prime Controls"

09:56  10  with the name "Prime Controls," but it's actually set

09:56  11  out that says:  The control -- from the contentions --

09:57  12  the control facility includes an automated controlling

09:57  13  with software that measures and monitors and controls

09:57  14  the pumps, dry coolers, and temperature of the fluid.

09:57  15            That's exactly what the Prime Control

09:57  16  systems does.  So Prime Control has been fully set out,

09:57  17  including Exhibit E, which is a manual that we have

09:57  18  cited to, that is the exact Prime Controls manual.

09:57  19            As far as the Kelvion coolers, in the

09:57  20  contentions themselves, we lay out that there are two

09:57  21  Kelvion coolers.  There's a Guntner coolers at the

09:57  22  Rockdale facilities; there's Kelvion coolers at the

09:57  23  Temple facility.  And they form the second -- secondary

09:57  24  cooling facility.

09:57  25            Again, those are fully disclosed in the

09:57  1    contentions, and they were the basis for Dr. Pokharna's

09:57  2    report.

09:57  3                As far as what was installed not being

09:57  4    reliable, yes.  It is true that they installed

09:57  5    significant portions of the Prime Control systems at

09:58  6    Temple, and then because they ran out of money, they

09:58  7    did delay that process.

09:58  8                However, we do know that there is

09:58  9    evidence that says that they are planning on re- --

09:58  10   turning that system on -- finishing that system and

09:58  11   turning it on later.

09:58  12               So they have substantially installed the

09:58  13   Prime Control systems.  They're on the 99-yard line.

09:58  14   They just haven't flipped the actual switch.

09:58  15               The system is still adapted to -- it's

09:58  16   still capable of taking these measurements once they

09:58  17   finish and flip the switch.

09:58  18               So they also have this issue where they

09:58  19   don't believe that we have disclosed the slots, that

09:58  20   they were surprised that we have the slots.

09:58  21               Well, again, if you look through the --

09:58  22   our opposition, we put pictures of the slots in the

09:58  23   first amended complaint.  We had -- in our supplement

09:58  24   to No. 4, we actually had a picture of the tape with

09:58  25   red lines showing where the slots were.

—18—

| | | |
|---|---|---|
| 09:59 | 1 | There's absolutely no surprise whatsoever |
| 09:59 | 2 | to anything in the -- Dr. Pokharna's report. |
| 09:59 | 3 | THE COURT:  I'll be back in just a |
| 09:59 | 4 | second. |
| 09:59 | 5 | (Pause in proceedings.) |
| 10:00 | 6 | THE COURT:  The Court grants that motion. |
| 10:00 | 7 | The next motion we have up is the motion |
| 10:00 | 8 | the exclude James Lee.  I'll hear from defendants on |
| 10:00 | 9 | that. |
| 10:00 | 10 | MS. BRANNEN:  Your Honor, on this motion, |
| 10:00 | 11 | we had two aspects of it.  Sorry.  For a moment, I |
| 10:00 | 12 | wasn't sure if you were calling on us or the other |
| 10:00 | 13 | counsel. |
| 10:00 | 14 | But the first aspect is a correction -- |
| 10:00 | 15 | what they call a correction, but it's really an |
| 10:00 | 16 | addition to Dr. Lee's report that he served at the end |
| 10:00 | 17 | of a deposition. |
| 10:00 | 18 | Their position just doesn't make any |
| 10:00 | 19 | sense on this.  They argue simultaneously that it is |
| 10:01 | 20 | duplicative of what was already in his report and that |
| 10:01 | 21 | it's necessary. |
| 10:01 | 22 | It can't be both.  And all I know is that |
| 10:01 | 23 | it's too late, and we ask Your Honor to exclude it. |
| 10:01 | 24 | The other thing that we are focusing on |
| 10:01 | 25 | in this motion is the fact that Dr. Lee is their |

10:01  1    rebuttal expert, not their opening expert.

10:01  2                    And he gave an opinion that based on

10:01  3    charts that he did not prepare, that apparently counsel

10:01  4    prepared, as they say they had been produced in

10:01  5    discovery, he gave an opinion that Midas' products

10:01  6    practice the patents.

10:01  7                    We think that opinion is unreliable.  But

10:01  8    in any event, it's too late -- too late for their

10:01  9    damages expert, their opening expert to have relied

10:01  10    upon it.

10:01  11                    And that's basically about it for that

10:01  12    opinion.  It's not plausible, and it also is too late

10:01  13    for the purposes they want to use it for in the case.

10:02  14                    THE COURT:  Who's going to respond to

10:02  15    this?

10:02  16                    MR. THOMAS:  Joseph Thomas.

10:02  17                    THE COURT:  Is there any reason why -- I

10:02  18    think I've gone over this -- why this couldn't be taken

10:02  19    care of by just allowing this gentleman to be deposed

10:02  20    now?

10:02  21                    I'm asking you, Counsel.

10:02  22                    MR. THOMAS:  You're asking Mr. Thomas?

10:02  23                    THE COURT:  I'm asking you.  I'm asking

10:02  24    you.  I don't know how to make it any clearer.  I'm

10:02  25    asking you to respond.

                                                                    —20—

10:02    1                    MR. THOMAS:  The -- Mr. Thomas.  Yes.

10:02    2                    THE COURT:  Yes.

10:02    3                    MR. THOMAS:  We're happy to let him be

10:02    4    deposed again if they want to.  We don't think they

10:02    5    need to.  They had his --

10:02    6                    THE COURT:  Well, I'm -- stop while

10:02    7    you're ahead.  I'm going to allow them -- I'm going to

10:02    8    deny the motion and allow them to depose the witness.

10:02    9                    Now, going back to Mr. -- or

10:02   10    Dr. Pokharna.  Is he your only infringement expert?

10:03   11                    MR. THOMAS:  Yes.

10:03   12                    THE COURT:  So what I'm going to do is --

10:03   13    it will obviously impact the trial setting, but I'm

10:03   14    going to allow you to amend his report, see if you can

10:03   15    fix it.  And you all will need to get together with

10:03   16    opposing counsel and figure out how long you think

10:03   17    it'll take for Dr. Pokharna to address any of the

10:03   18    issues that you think would make his opinion survive a

10:03   19    future challenge.

10:03   20                    And then y'all can set up a schedule to

10:03   21    figure out how to deal with that in terms of rebuttal

10:03   22    reports and all that.  So I'm going to allow him to

10:03   23    amend his report.

10:03   24                    Next up I have the motion to exclude -- I

10:03   25    don't know if it's a doctor or not.  I don't think it

| 10:03 | 1  | is -- Duross O'Bryan.  This is the defendants' motion. |
| 10:04 | 2  | MS. BRANNEN:  Thank you, Your Honor. |
| 10:04 | 3  | THE COURT:  This one -- this one has both |
| 10:04 | 4  | lost profits and a reasonable royalty analysis. |
| 10:04 | 5  | MS. BRANNEN:  That's correct. |
| 10:04 | 6  | Is my screen successfully sharing?  We |
| 10:04 | 7  | prepared a few slides on this one. |
| 10:04 | 8  | Midas' damages opinion -- damages expert |
| 10:04 | 9  | makes four main errors that we believe are substantial |
| 10:04 | 10 | and not just matters that we should have to cross them |
| 10:04 | 11 | on, Your Honor.  The first error pervades both his lost |
| 10:04 | 12 | profits and his reasonable royalty damages. |
| 10:08 | 13 | (Clarification by Reporter.) |
| 10:08 | 14 | (Recess taken.) |
| 10:08 | 15 | THE COURT:  Let's go back on the record. |
| 10:08 | 16 | MS. BRANNEN:  Thank you, Your Honor. |
| 10:08 | 17 | This is Elizabeth Brannen, addressing the motion to |
| 10:08 | 18 | exclude Midas' damages expert, Mr. O'Bryan. |
| 10:08 | 19 | The first error he made pervades his lost |
| 10:08 | 20 | profits and reasonable royalty opinions, both of them. |
| 10:08 | 21 | And he basically doubles his damages number by assuming |
| 10:08 | 22 | that Rhodium would continue infringing for almost three |
| 10:09 | 23 | years past trial, even if there's a jury verdict of |
| 10:09 | 24 | infringement. |
| 10:09 | 25 | Now, the patent -- he's -- the patent |

—22—

```
10:09   1    doesn't expire till something like 2035.  He's not
10:09   2    giving an opinion about a fully paid-up license.  This
10:09   3    is something different going on.  He's saying he has
10:09   4    the ability to award damages after trial based on
10:09   5    speculation that my client would continue to infringe.
10:09   6    And there's just no basis for that.  Certainly no
10:09   7    reliable basis.
10:09   8             If we look at the basis he said he had --
10:09   9    I'll try sharing my screen here to put some of this --
10:09  10    make some of this visible -- he's relying only on a
10:09  11    single projection, and that projection is something
10:09  12    that Rhodium filed in connection with a potential
10:09  13    merger transaction.  And that document just says that
10:09  14    Midas -- that Rhodium -- excuse me -- plans to expand
10:09  15    its operations to full capacity if the merger goes
10:10  16    through.
10:10  17             Well, two problems.  First of all,
10:10  18    expanding your operations doesn't say anything about
10:10  19    whether you would continue infringing or ignore an
10:10  20    infringing verdict.  And even more importantly, that
10:10  21    merger never happened.  It was canceled.  And
10:10  22    Mr. O'Bryan omitted the -- didn't take into account the
10:10  23    fact that he just assumed that --
10:10  24             THE COURT:  Let me interrupt you and hear
10:10  25    a response to that argument.
```

23

```
10:10   1              MR. THOMAS:  Your Honor, the
10:10   2   representations made in that S-1 were for a merger that
10:10   3   was canceled, but the representations were not
10:10   4   conditional.  They did not say, If we get the merger,
10:10   5   we'll do this expansion.  They just said that our
10:10   6   business plan is to expand.
10:10   7              That's what they told their investors.
10:10   8   They had existing investors and the prospective new
10:10   9   investors through the merger.  So those representations
10:11  10   are from Rhodium of their own expansion plans, which
10:11  11   are reasonable for Mr. O'Bryan to rely upon.
10:11  12              THE COURT:  Did he or did he not rely on
10:11  13   that merger when he -- when he comes in and he says,
10:11  14   This is what I did.  I looked and there's this document
10:11  15   that shows there's going to be a merger and -- to rely
10:11  16   on and the merger didn't happen, is that what he's
10:11  17   going to say?
10:11  18              MR. THOMAS:  No.  He's going to say these
10:11  19   are representations that they issued that were not
10:11  20   conditioned upon the merger.  They were made in the
10:11  21   public forum.  And I'm going to rely on their
10:11  22   representations to their investors that they had a
10:11  23   plan -- they have a plan to expand.
10:11  24              THE COURT:  Okay.  Is there anything else
10:11  25   you'd like to say with respect to the lost profits
```

```
10:11   1    argument that the defendant is making?
10:11   2              MR. THOMAS:  Yes, Your Honor.  The lost
10:11   3    profit analysis was done correctly.  It was based on
10:12   4    information that was available to the experts.  Both
10:12   5    sides' experts have acknowledged there are no licenses.
10:12   6    This is relatively brand-new technology in this field.
10:12   7    This immersion cooling technology hasn't been licensed.
10:12   8              Mr. O'Bryan properly used the sales of
10:12   9    the product as a basis, and there's good case law we
10:12  10    cited for him to rely upon the sales as a basis to
10:12  11    determine the reasonable royalty, and the profits from
10:12  12    those sales to support that reasonable royalty
10:12  13    analysis.
10:12  14              THE COURT:  Would you give me an example?
10:12  15              MR. THOMAS:  Yes.  They -- they -- our
10:12  16    deadlines made a significant sale to a company known as
10:12  17    RITE.  It's a public company.  It's one of the largest
10:12  18    bitcoin mining companies in the -- North America, if
10:12  19    not the U.S. -- if not nationally -- internationally.
10:12  20              And those sales occurred well within
10:13  21    months or within a year or so of the time that the
10:13  22    license would have been negotiated.  And under the Book
10:13  23    of Wisdom, Mr. O'Bryan used those sales to forecast
10:13  24    what the expected profits would be of my client in
10:13  25    terms of making assumption on how to --
```

| | | |
|---|---|---|
| 10:13 | 1 | THE COURT: How does the Book of Wisdom, |
| 10:13 | 2 | what does that have to do with lost profits? |
| 10:13 | 3 | MR. THOMAS: Well, the lost -- we believe |
| 10:13 | 4 | that the sale of the -- |
| 10:13 | 5 | THE COURT: No, no. What does the book |
| 10:13 | 6 | of profits -- what does that have to do with lost |
| 10:13 | 7 | profits? I don't understand. |
| 10:13 | 8 | MR. THOMAS: Well, the -- we believe that |
| 10:13 | 9 | the case law allows Mr. O'Bryan -- |
| 10:14 | 10 | THE COURT: Tell me any case that |
| 10:14 | 11 | discusses the Book of Wisdom in a context of lost |
| 10:14 | 12 | profits. |
| 10:14 | 13 | MR. THOMAS: Okay. Well, Your Honor, we |
| 10:14 | 14 | don't need the Book of Wisdom. Rhodium installed |
| 10:14 | 15 | 200 megawatts. He's using their actual installation as |
| 10:14 | 16 | the basis to determine a sale that would have been made |
| 10:14 | 17 | by my client to Rhodium of those products. And using |
| 10:14 | 18 | those -- that sales information, he projected his lost |
| 10:14 | 19 | profits. |
| 10:14 | 20 | THE COURT: Okay. I'll be back in just a |
| 10:14 | 21 | second. |
| 10:14 | 22 | (Pause in proceedings.) |
| 10:15 | 23 | THE COURT: This question is for -- sorry |
| 10:15 | 24 | for all the coughing -- either party, but I'll start |
| 10:15 | 25 | with the party that is moving for this, the defendant. |

| | |
|---|---|
| 10:15 | 1 |
| 10:16 | 2 |
| 10:16 | 3 |

10:15   1           What specific paragraphs in his -- in the

10:16   2   report are you asking me to strike on lost profits?

10:16   3   Can you articulate those into the record?

10:16   4           MS. BRANNEN:  Your Honor, I would need a

10:16   5   moment to pull it up and articulate them into the

10:16   6   record, but we're asking to strike his entire lost

10:16   7   profits opinion, because he has no basis --

10:16   8           THE COURT:  Is it -- I'm sorry.  Is it

10:16   9   divided up, lost profits -- I'm making this up --

10:16   10   Page 1 through 10, reasonable royalty, 11 through 20.

10:16   11   Is it -- is it that clean?

10:16   12           MS. BRANNEN:  I believe it's fairly

10:16   13   clean.  Let me show my screen to give an example of one

10:16   14   page.  Let me see if I can do it.

10:16   15           So here's an example of a table in his

10:16   16   report.  And he's very clear at the top about what his

10:16   17   reasonable royalty number is.  And then underneath

10:16   18   that, he's clear -- he's got a separate line item for

10:16   19   what his lost profits opinion is.  And so the report is

10:16   20   well organized in the sense that his lost profits

10:16   21   opinions are coherent.  And I apologize that I don't

10:17   22   know exactly those, but if we take a short break, I

10:17   23   can --

10:17   24           THE COURT:  Here's what I'm going to do.

10:17   25   We've gone over -- I'm going to grant the motion with

| | | |
|---|---|---|
| 10:17 | 1 | respect to lost profits.  Same deal.  If the |
| 10:17 | 2 | defendant -- I'm sorry -- the plaintiff wants to have |
| 10:17 | 3 | their expert redo the lost profits and try and go |
| 10:17 | 4 | again, that's fine.  You all need to figure out how to |
| 10:17 | 5 | do the schedule. |
| 10:17 | 6 | I'm going to deny the motion with respect |
| 10:17 | 7 | to the -- his reasonable royalty calculations. |
| 10:17 | 8 | Next up, I have the motion for summary |
| 10:17 | 9 | judgment of noninfringement.  I'll hear from the |
| 10:17 | 10 | defendant on that, please. |
| 10:17 | 11 | MS. BRANNEN:  Thank you, Your Honor. |
| 10:17 | 12 | May I clarify the Court's ruling on |
| 10:17 | 13 | Mr. O'Bryan?  The posttrial damages period that he has |
| 10:17 | 14 | is in his lost profits, but it also pervades his |
| 10:18 | 15 | reasonable royalty.  Is there a separate ruling on the |
| 10:18 | 16 | aspect of damages -- |
| 10:18 | 17 | THE COURT:  So I usually don't have a |
| 10:18 | 18 | problem with the jury answering future reasonable |
| 10:18 | 19 | royalty, because then at least we have a reasonable |
| 10:18 | 20 | royalty rate.  And if the plaintiff is successful, then |
| 10:18 | 21 | the jury will have spoken as to the reasonable royalty |
| 10:18 | 22 | rate, which is probably what I would consider applying |
| 10:18 | 23 | on damages going forward, if you continued to make |
| 10:18 | 24 | sales. |
| 10:18 | 25 | And they're not going to get those |

—28—

```
10:18   1   damages, future damages, unless you -- the sales were
10:18   2   actually made.  And the way I've done it in the past,
10:18   3   both as a lawyer and as a judge, is let's say plaintiff
10:18   4   wins.  Reasonable royalty rate -- I'll make up
10:18   5   something -- 5 percent.  I would allow you -- allow the
10:18   6   defendant to continue to sell and -- but they would
10:18   7   have to put into the registry of the Court the
10:19   8   6 percent.  If you stopped selling, there would be no
10:19   9   future damages under a reasonable royalty deal.  Does
10:19  10   that sound -- is that what you were asking me?
10:19  11            MS. BRANNEN:  Thank you, Your Honor.
10:19  12   Yes.  I think it clarifies it.  In other words, as I
10:19  13   understand it, lost profits, they've got to completely
10:19  14   redo it if they want to try to get it in.
       15            THE COURT:  Correct.
10:19  16            MS. BRANNEN:  Reasonable royalty, they --
10:19  17            THE COURT:  And I'll say right now, lost
10:19  18   profits -- is there -- let me ask the plaintiffs:  Is
10:19  19   there no request for an injunction here?
10:19  20            MR. THOMAS:  No.  No, Your Honor.  There
10:19  21   isn't.
10:19  22            THE COURT:  Okay.  Is there a reason
10:19  23   there's not a request for injunction?
10:19  24            MR. THOMAS:  I'm sorry.  I misspoke.
10:19  25   There is a request for an injunction.
```

| | | |
|---|---|---|
| 10:19 | 1 | THE COURT: Okay. So generally speaking |
| 10:19 | 2 | again, what I will do is, with regard -- if it's a lost |
| 10:19 | 3 | profits, I probably will have to -- I probably won't |
| 10:19 | 4 | give them a question on future lost profits, but again, |
| 10:20 | 5 | and this is because we don't know whether there'd be |
| 10:20 | 6 | any, I will take up the injunction question because you |
| 10:20 | 7 | all, I assume, are competitors or you wouldn't have |
| 10:20 | 8 | lost profits. |
| 10:20 | 9 | And so but I will -- so don't anticipate |
| 10:20 | 10 | getting a lost profits question going forward, but if |
| 10:20 | 11 | you can redo it and you think you can get past a |
| 10:20 | 12 | Daubert challenge, I'll do it for both prior. And then |
| 10:20 | 13 | if -- again, only if the plaintiff wins, if the |
| 10:20 | 14 | defendant comes in and says, No, you shouldn't give an |
| 10:20 | 15 | injunction, well, then we'll have to figure out a way |
| 10:20 | 16 | to be fair to the plaintiff to make sure how we assess |
| 10:20 | 17 | damages going forward. And I'll take care of that. |
| 10:20 | 18 | So did I make it clearer or less clear on |
| 10:20 | 19 | what I just said for everyone? I'm happy to answer any |
| 10:20 | 20 | questions that you have. |
| 10:20 | 21 | MS. BRANNEN: Your Honor, this is |
| 10:20 | 22 | Elizabeth Brannen for Rhodium. Just I think it's clear |
| 10:21 | 23 | with respect to the original question I was asking. |
| 10:21 | 24 | So for their reasonable royalty, they're |
| 10:21 | 25 | not going to get a damages award past trial |

| | | |
|---|---|---|
| 10:21 | 1 | automatically, they have to present what it is through |
| 10:21 | 2 | trial and then they can get a separate ruling on if |
| 10:21 | 3 | Rhodium were to continue to infringe, what could the |
| 10:21 | 4 | reasonable royalty be after that.  Have I -- |
| 10:21 | 5 | THE COURT:  Right.  And I've seen it |
| 10:21 | 6 | handled two ways, and I would let you all argue what's |
| 10:21 | 7 | fair.  I've seen it where the jury's given an amount -- |
| 10:21 | 8 | I'm making this up again -- 5 percent.  And so you give |
| 10:21 | 9 | the 5 percent.  This is where the Book of Wisdom does |
| 10:21 | 10 | come in.  You know, they will have figured that out. |
| 10:21 | 11 | But I've also seen judges who have |
| 10:21 | 12 | considered giving a slightly higher, going forward, |
| 10:21 | 13 | because it's now -- the jury's now found infringement. |
| 10:21 | 14 | So but they're -- I'm not going to award -- now, I |
| 10:21 | 15 | didn't hear anyone talk about a lump sum.  If there is |
| 10:21 | 16 | a lump-sum award that goes through the end of the -- |
| 10:22 | 17 | that would go through the end of the patent, whenever |
| 10:22 | 18 | that is, which is a period going forward, but |
| 10:22 | 19 | obviously, it's an amount that neither of y'all have |
| 10:22 | 20 | done yet and that someone would say, as opposed to |
| 10:22 | 21 | reasonable royalty, we would take -- the plaintiff |
| 10:22 | 22 | would have taken a lump sum of X and y'all would have |
| 10:22 | 23 | paid a lump sum of X and -- y'all have -- but y'all |
| 10:22 | 24 | haven't done that.  So that's not an issue here. |
| 10:22 | 25 | So as far as I can tell, from the way the |

| | | |
|---|---|---|
| 10:22 | 1 | plaintiffs have structured their damages model, they |
| 10:22 | 2 | won't be getting future damages until we see if they |
| 10:22 | 3 | win and what I do on the injunction, and then if there |
| 10:22 | 4 | is not an injunction and you all do continue to sell |
| 10:22 | 5 | what the jury has determined to be infringing, I'll |
| 10:22 | 6 | make sure we come up with some way of making sure the |
| 10:22 | 7 | plaintiff is protected financially. |
| 10:22 | 8 | Anything else? |
| 10:22 | 9 | MS. BRANNEN:  Just I would like to |
| 10:22 | 10 | clarify, my client is not a competitor of Midas Green, |
| 10:23 | 11 | not even allegedly.  And that's part of why they have |
| 10:23 | 12 | such a trouble of meeting the lost profits standard. |
| 10:23 | 13 | THE COURT:  Well, then they're going to |
| 10:23 | 14 | have a really tough time getting an injunction. |
| 10:23 | 15 | MS. BRANNEN:  I don't even believe |
| 10:23 | 16 | there's a live injunction request, Your Honor.  That |
| 10:23 | 17 | was news to me.  I do not think they've preserved it. |
| 10:23 | 18 | I certainly don't think they have -- |
| 10:23 | 19 | THE COURT:  Well, they've told me there's |
| 10:23 | 20 | an injunction request.  Maybe there is; maybe there |
| 10:23 | 21 | isn't.  I don't know. |
| 10:23 | 22 | MS. BRANNEN:  Thank you. |
| 10:23 | 23 | THE COURT:  I'm up with the law, that |
| 10:23 | 24 | they only get one if y'all are competitors.  And I |
| 10:23 | 25 | don't know -- I'll know much better after trial whether |

10:23   1    or not I think you're competitors.

10:23   2                MR. THOMAS:  Your Honor, that is a

10:23   3    disputed issue in this case.  We contend, Your Honor,

10:23   4    we are competitors.

10:23   5                THE COURT:  Well, I have no way of

10:23   6    knowing which of you is right.

10:23   7                So next up we have the motion for summary

10:23   8    judgment of noninfringement.  I'll take that up.

10:23   9                MS. BRANNEN:  Thank you, Your Honor.

10:23  10                So the technology at issue involves

10:24  11    systems for pooling bitcoin miners.  The computers that

10:24  12    do the mining get very hot when they're mining bitcoin.

10:24  13                And in particular, the patent and the

10:24  14    accused systems -- and you can see a picture -- some of

10:24  15    the accused systems, they relate to their immersion

10:24  16    cooling systems.  Meaning, there are miners that get

10:24  17    immersed in dielectric fluid.  It doesn't conduct

10:24  18    electricity.  And as the liquid is circulated through

10:24  19    the system, it removes heat from the miners.

10:24  20                We believe a lot of limitations are

10:24  21    missing, but we focused our motion on a single claim

10:24  22    limitation.  And we believe it's the rare case where

10:24  23    Midas doesn't have any evidence that Rhodium uses

10:24  24    anything like this limitation that's shown here.

10:24  25                And it requires the system to have a

10:24  1    control facility, and that control facility has to be

10:24  2    adapted to coordinate the operation of two different

10:25  3    fluid circulation facilities, a primary facility and a

10:25  4    secondary facility.

10:25  5            And it has to be adapted to coordinate

10:25  6    their operation based on this recited variable as a

10:25  7    function of the temperature of the dielectric fluid in

10:25  8    the tank containing the bitcoin miners.

10:25  9            And we don't -- basically, for the

10:25  10   primary fluid circulation facility, you can think of

10:25  11   that as the pipes and pumps.  That's what they say it

10:25  12   is.  We may take issue with that at trial, but not for

10:25  13   purposes of this motion.

10:25  14           Similarly, for the secondary fluid

10:25  15   circulation facility, they point to these large coolers

10:25  16   that have fans in them.  So you can think of the

10:25  17   primary as pumps and pipes; secondary, they say it's

10:25  18   the fans and the dry coolers.

10:25  19           And we pointed out in our motion that we

10:25  20   don't take the temperature of the fluid in the tank,

10:26  21   and we don't use it for anything, let alone to

10:26  22   coordinate either of those facilities, those fluid

10:26  23   circulation facilities.

10:26  24           Reading their opposition, you could be

10:26  25   forgiven for assuming that I'd be standing in front of

10:26  1    you asking for a very narrow special construction of

10:26  2    this term, but that's not what we're doing.

10:26  3              Our motion, we construed nothing.  We

10:26  4    agree that this term gets its plain meaning, and we

10:26  5    don't have this limitation or anything like it.

10:26  6              And so in our motion, we went through all

10:26  7    the various theories their expert had put forth, some

10:26  8    of which have been addressed in the motion to exclude

10:26  9    Dr. Pokharna, where the opinions weren't in their final

10:26  10   infringement contentions.

10:26  11             But we went through all the various

10:26  12   theories of why they said this limitation was present,

10:26  13   and we debunked each of them.  And we showed why the

10:26  14   limitation isn't there literally and why, in those

10:26  15   instances when he had offered an opinion under the

10:26  16   doctrine of equivalents, there was no -- nothing in the

10:27  17   report, no evidence that could satisfy that standard

10:27  18   for insubstantial differences for same

10:27  19   function-way-result.

10:27  20             So the first thing I'd like to hopefully

10:27  21   establish in this motion is that based on the DMM

10:27  22   Specialities case, which we cite in our reply at Page 2

10:27  23   and also just common sense, their opposition makes no

10:27  24   attempt whatsoever to defend or salvage any of

10:27  25   Dr. Pokharna's theories under the doctrine of

| | | |
|---|---|---|
| 10:27 | 1 | equivalents. |
| 10:27 | 2 | You can scour their opposition.  The word |
| 10:27 | 3 | "equivalent" isn't there.  "Equivalents" isn't there. |
| 10:27 | 4 | "DOE" isn't there.  "Insubstantial" or "substantial |
| 10:27 | 5 | differences," it's just not discussed.  They have |
| 10:27 | 6 | waived this. |
| 10:27 | 7 | And I'm happy also to go through each of |
| 10:27 | 8 | the things that they have -- all the various theories |
| 10:27 | 9 | they pointed to and show why there is a failure under |
| 10:27 | 10 | the plain meaning of this limitation to show that we |
| 10:27 | 11 | have anything like it. |
| 10:28 | 12 | But the first system that they accuse are |
| 10:28 | 13 | the Prime Controls and Kelvion sensors.  Those are the |
| 10:28 | 14 | ones that are admittedly inoperable that I believe have |
| 10:28 | 15 | been excluded in connection with Dr. Pokharna's report. |
| 10:28 | 16 | And I don't think this is fixable, Your |
| 10:28 | 17 | Honor.  There is no -- there's attorney argument, and |
| 10:28 | 18 | we heard some of the attorney argument from |
| 10:28 | 19 | Mr. Kolegraff. |
| 10:28 | 20 | But this is a system where most of the |
| 10:28 | 21 | sensors are missing and none of the sensors they're |
| 10:28 | 22 | pointing to is wired in.  And perhaps more importantly, |
| 10:28 | 23 | their expert, you can see the interrogatory response |
| 10:28 | 24 | they cite to in their opposition at Page 13, saying: |
| 10:28 | 25 | Even where a sensor is connected, it is not wired in. |

10:28  1          Their expert, Dr. Pokharna, conceded that

10:28  2   in its present state, this system cannot measure

10:28  3   temperature.

10:28  4          Now, even if this was operational, they

10:29  5   haven't explained what they believe the plain meaning

10:29  6   of this limitation is or why what this system was

10:29  7   designed to measure would actually be adapted to

10:29  8   coordinate both control facilities.

10:29  9          And so that's also another problem with

10:29  10  this whole theory, that you can see up here the

10:29  11  sensors, where they would go, are in an entirely

10:29  12  different building and they have a little sign they

10:29  13  have labeled -- their own expert has labeled that the

10:29  14  building containing the tanks with the miners is in a

10:29  15  completely different place.

10:29  16          This wouldn't be the variable they need

10:29  17  to show that we're using, and they also can't show that

10:29  18  it would be adapted to coordinate both fluid

       19  circulation facilities.

10:29  20          The only evidence they give is shown

10:29  21  here, that it would be adapted to adjust the fan speed.

10:29  22  Well, that's what they say is the secondary circulation

10:29  23  facility.  In order to survive summary judgment, they

10:29  24  should have to present evidence and explain how that

10:30  25  evidence could lead a reasonable juror to believe that

| | | |
|---|---|---|
| 10:30 | 1 | the claim language is satisfied with respect to both |
| 10:30 | 2 | circulation facilities and being adapted to coordinate |
| 10:30 | 3 | the operation of both of them. And they just can't do |
| 10:30 | 4 | that for the main thing that they spent the most time |
| 10:30 | 5 | on in their brief, which is this Prime Controls and |
| 10:30 | 6 | Kelvion coolers. |
| 10:30 | 7 | And by the way, they briefed those |
| 10:30 | 8 | separately, but Prime Controls and other vendors were |
| 10:30 | 9 | hired to build the monitoring system for the Kelvion |
| 10:30 | 10 | cooler. So even though they talk about the Prime |
| 10:30 | 11 | Control system and then they talk about the Kelvion |
| 10:30 | 12 | coolers, you can see, for example, from their brief at |
| 10:30 | 13 | Page 18, the thing they're citing to for the Kelvion |
| 10:30 | 14 | coolers as evidence that those infringe, that's all |
| 10:30 | 15 | design documents of Prime Controls. That was |
| 10:30 | 16 | admittedly never installed and is admittedly |
| 10:30 | 17 | inoperable, cannot measure any temperature. |
| 10:30 | 18 | So at the last page of their brief, they |
| 10:30 | 19 | give a couple throwaways to try to defend a theory of |
| 10:31 | 20 | infringement based on the Guntner coolers. These are |
| 10:31 | 21 | shown here. These are only at Rhodium's Rockdale |
| 10:31 | 22 | facility. |
| 10:31 | 23 | And again, the tanks containing the |
| 10:31 | 24 | miners are in one place, and the coolers they're |
| 10:31 | 25 | pointing to are outside the building. And what their |

—38—

10:31    1    theory is here is that Rhodium measures the temperature

10:31    2    of the fluid after it comes out of the cooler.

10:31    3                    Well, that obviously is not literally the

10:31    4    same thing as the fluid in the tanks nor is it even

10:31    5    arguably insubstantially different.

10:31    6                    And they also -- for this one too, all

10:31    7    they say is that we might use it to adjust the fan

10:31    8    speed in these coolers.  There's no evidence they can

10:31    9    point the Court to of how this is in any way adapted to

10:31    10    coordinate the operation of what they've pointed to as

10:31    11    the primary fluid circulation facility, the pumps and

10:31    12    the pipes.

10:31    13                    So it's deficient in multiple respects.

10:31    14    And the single paragraph in their opposition that's

10:32    15    dedicated to try to revive this doesn't answer the

10:32    16    question of how this is using the right variable in any

10:32    17    way, let alone using any variable to control both fluid

10:32    18    circulation facilities.  They only talk about fans.

10:32    19                    Then the final thing that they also try

10:32    20    to revive is the fact that in both facilities, Temple

10:32    21    and Rockdale, Rhodium can measure the temperature of

10:32    22    the chips in the miners and the printed circuit boards

10:32    23    in the miners.

10:32    24                    Their expert, though -- obviously

10:32    25    measuring a chip temperature or a board temperature is

10:32  1   not measuring the temperature of the tank fluid.  And

10:32  2   their expert admitted those are different.  So there's

10:32  3   no literal infringement.  There's no analysis of why it

10:32  4   would be insubstantially different.

10:32  5            And again, here too, all they say with

10:32  6   PCB temperature is that we can monitor it.  All they

10:32  7   say with chip temperature is that we can shut off the

10:33  8   miner or reduce power to the miner.

10:33  9            But what they haven't said is what

10:33  10  evidence is there anywhere in the record that we could

10:33  11  use either the chip or PCB temperature to coordinate

10:33  12  the operation of the pumps and pipes or of the fans,

10:33  13  which they say are the primary and the secondary

10:33  14  circulation facilities.

10:33  15           There is no evidence.  It's a rare case

10:33  16  where none of their theories even make sense.  And we

10:33  17  hope they should have to articulate one that we can at

10:33  18  least understand what this jury is going to be asked to

10:33  19  decide before they would be allowed to proceed.

10:33  20           THE COURT:  A response?

10:33  21           MR. KOLEGRAFF:  Yes.  So as -- there are

10:33  22  just a lot of triable issues of material fact here.

10:33  23  And what Rhodium has done to try to eliminate those

10:33  24  facts is they've taken a very unusual reading -- a

10:33  25  plain reading of Claim 1.

—40—

10:33  1              And what they're trying to say is that

10:33  2  you have to have your temperature sensor in the tank to

10:33  3  take the temperature of the fluid.

10:34  4              Their entire motion is based upon that

10:34  5  premise, that they have to require a sensor in the tank

10:34  6  taking the temperature of the fluid.  But the claim

10:34  7  just doesn't say that.

10:34  8              Now, this is extremely important to it.

10:34  9  On Page 2 of their motion, they say:  In other words,

10:34  10  to infringe Midas' asserted claims, a cooling system

10:34  11  must take advantage of the dielectric fluid while it

10:34  12  is -- must take the temperature while it is in the

10:34  13  tank.

10:34  14              They say the same thing on Page 4:

10:34  15  Neither of the tanks have a fluid temperature in the

10:34  16  tank.

10:34  17              This is repeated throughout their motion.

10:34  18  That is the basis for this entire motion, is that there

10:34  19  has to be a temperature sensor inside the tank in order

10:34  20  to take the temperature.

10:34  21              If we look at Claim 1 and parse it, it

10:34  22  talks about:  A control facility adapted to coordinate

10:34  23  the operation of the primary and secondary fluid

10:35  24  circulation facilities as a function of the temperature

10:35  25  of the dielectric fluid in the tank.

| | | |
|---|---|---|
| 10:35 | 1 | That plain reading does not say where a |
| 10:35 | 2 | temperature sensor has to be.  It certainly doesn't |
| 10:35 | 3 | place it in the tank.  It certainly doesn't even say |
| 10:35 | 4 | you have to take the measurement of the fluid itself. |
| 10:35 | 5 | All you have to do is collect enough |
| 10:35 | 6 | information so that you can coordinate the operation of |
| 10:35 | 7 | the two circulation facilities. |
| 10:35 | 8 | So here you can have that sensor -- that |
| 10:35 | 9 | temperature sensor, you could have it in the tank.  You |
| 10:35 | 10 | don't have to.  But you could have it on the pipe |
| 10:35 | 11 | leading out of the tank.  You could have it on the |
| 10:35 | 12 | inlet pipe to the tank.  You could have it further down |
| 10:35 | 13 | towards the coolers. |
| 10:35 | 14 | Every one of those data points, every one |
| 10:35 | 15 | of those points, is going to give you sufficient data |
| 10:35 | 16 | in order to make decisions on how you want to run your |
| 10:35 | 17 | pumps and fans. |
| 10:35 | 18 | For example, we are talking about the |
| 10:35 | 19 | Guntner coolers, which are the coolers that sit out in |
| 10:35 | 20 | the -- outside the building, there, we are measuring |
| 10:36 | 21 | the fluid temperature that comes out of the cooler. |
| 10:36 | 22 | That is the exact same temperature as is |
| 10:36 | 23 | going into the tank.  So we are measuring the |
| 10:36 | 24 | temperature of the fluid in the tank, and we adjust the |
| 10:36 | 25 | fan speeds of that Guntner -- excuse me -- Rhodium |

—42—

10:36  1   adjusts the fan speeds of the Guntner cooler to make

10:36  2   sure that that inlet temperature to the tank remains

10:36  3   very constant.

10:36  4              We know for a fact that the claim does

10:36  5   not require that the temperature sensor be in the tank,

10:36  6   and we know it for at least a couple of reasons.

10:36  7              First of all, if we look at Figure 13 of

10:36  8   the patent, there are sensors that are shown not only

10:36  9   in the reservoir, which is separate from the tank, but

10:36 10   the temperature sensors are also shown in the fluid

10:36 11   pipes and shown in the fluid pipes of the primary

10:36 12   circulation facility and shown as the temperature

10:37 13   sensors in the secondary facility.

10:37 14              So even the embodiments that we have in

10:37 15   the patent do not show the sensor in the tank.

10:37 16              It's also shown in Figures 4 and 12 where

10:37 17   you have the tank, which is numbered 14, the tank 14

10:37 18   does not have a sensor in it.  The only sensor is in

10:37 19   the recovery reservoir, which is No. 42.  So again,

10:37 20   even the embodiments that we have in the patent do not

10:37 21   require that the sensor be in the tank.

10:37 22              So let's talk a little bit about Prime

10:37 23   Controls.  Prime Controls is a very sophisticated

10:37 24   control system that has no other purpose in life but to

10:37 25   control and manage the system at the Temple facility.

—43—

| | | |
|---|---|---|
| 10:37 | 1 | There are temperature sensors, there are pump controls, |
| 10:37 | 2 | there are reporting facilities.  They spent millions of |
| 10:37 | 3 | dollars putting this thing in, and it has no |
| 10:37 | 4 | noninfringing functionality. |
| 10:37 | 5 | Again, if you look at Exhibit G of our |
| 10:38 | 6 | opposition, you can see that they have the layout of |
| 10:38 | 7 | the complete system, the entire plumbing and design |
| 10:38 | 8 | system.  H shows a picture of the Kelvion and Temple |
| 10:38 | 9 | coolers that have the temperature sensors installed. |
| 10:38 | 10 | They're already there in the pipes. |
| 10:38 | 11 | They talked about saddles being |
| 10:38 | 12 | installed.  They purchased saddles to put on those |
| 10:38 | 13 | pipes so they can make the finishing of the |
| 10:38 | 14 | installation even easier. |
| 10:38 | 15 | If you look at Exhibit I, there is an |
| 10:38 | 16 | issued-for-approval manual on how this whole system is |
| 10:38 | 17 | supposed to be put together, this Prime Control system, |
| 10:38 | 18 | and it shows all of these things working and in |
| 10:38 | 19 | operation.  So it's almost fully installed.  They just |
| 10:38 | 20 | haven't flipped the final switch. |
| 10:38 | 21 | And let's -- we're going to suggest here, |
| 10:38 | 22 | is that they have just not turned on that switch |
| 10:39 | 23 | because of this litigation.  As soon as this litigation |
| 10:39 | 24 | is over, you know, they're very likely to turn this |
| 10:39 | 25 | thing back on because, again, they've got a million |

10:39   1    dollars of sunk costs, that they're going to need to

10:39   2    turn on.  And we have an e-mail, this is from a Depo

10:39   3    Exhibit 77, that says:  Our plan -- and that's

10:39   4    referring to Rhodium -- Our plan is to get Prime

10:39   5    Controls paid back and then have Prime Controls finish

10:39   6    the rest of the work on the site.

10:39   7           So that is a huge issue of fact, whether

10:39   8    or not Rhodium is going to reactivate or activate this

10:39   9    Prime Controls when this litigation is over.

10:39   10           Also, so -- also, how much work they have

10:39   11    left to do is also a huge issue of fact as it goes to

10:39   12    Prime Controls.

10:39   13           As far as any waiver, we've waved

10:39   14    nothing.  We attached the entire report of

10:40   15    Dr. Pokharna, where he goes not only through literal

10:40   16    infringement, he goes through doctrine of equivalents

10:40   17    infringement on all of these issues.

10:40   18           As far as the Kelvion systems at Temple,

10:40   19    that really reduces down to the same arguments we were

10:40   20    just talking about with Prime Controls.  That is, the

10:40   21    temperature sensors are there.  The computers are in

10:40   22    place.  It's basically all set to go, they just have to

10:40   23    finish wiring it up and then they're going to be able

10:40   24    to control the Kelvion coolers based upon the

10:40   25    temperature of the coolant.

10:40  1              At Guntner, which is at the Rockdale
10:40  2    facility, that we do know is in operation.  They
10:40  3    actually have the Guntner coolers that sense the
10:40  4    temperature of the fluid as it's exiting the Guntner
10:40  5    coolers.  And based upon that temperature, they adjust
10:40  6    the fan speed.  This is in the Guntner motor managing
10:40  7    manual.
10:40  8              They adjust the speed of the fans to keep
10:40  9    that outlook temperature the same.  That outlook
10:40 10    temperature fluid is the temperature of the fluid as
10:41 11    it's going into the tank.
10:41 12              Finally, we get to the Restful API, which
10:41 13    is this idea that we're checking the temperature of the
10:41 14    fluid in the tank by using functionality built into the
10:41 15    miners.  These miners, which are just very
10:41 16    sophisticated computers, actually have a couple
10:41 17    different sets of temperature gauges, sensors inside of
10:41 18    the miners.  One of those is to measure the temperature
10:41 19    of the PCB board, the printed circuit board.  And the
10:41 20    printed circuit board is what's setting up against the
10:41 21    fluid.  So that is measuring the temperature of the
10:41 22    fluid.
10:41 23              And based upon that, the system
10:41 24    automatically puts more power on to the miner, if it
10:41 25    can handle warming the fluid similar.  If the fluid is

10:41  1    too warm, then it actually powers down the miner; it

10:41  2    has the miner generate less power.  That way it adjusts

10:41  3    the amount of heat that is injected into the system,

10:41  4    which is controlling the circulation of both the

10:42  5    primary and the secondary circulation facilities.

10:42  6                So here we just have a lot of issues of

10:42  7    fact as to whether or not Prime Controls is going to be

10:42  8    actually finished.  We've got questions of fact as to

10:42  9    how the Guntner is actually managing the fan speed to

10:42  10   control the temperature of the tank; and really, all

10:42  11   gets down to their assertion that the temperature probe

10:42  12   has to be in the tank, which is just not the plain

10:42  13   meaning of this claim.

10:42  14               So with that, I'll turn it back.

10:42  15               MS. BRANNEN:  May I respond?

10:42  16               THE COURT:  Rebuttal?

10:42  17               Please.

10:42  18               MS. BRANNEN:  Thank you.

10:42  19               So I'll try to make five or fewer points.

10:42  20   First, I want to talk about what we did not hear.

10:42  21   Normally, to oppose summary judgment where we would --

10:42  22   you would hear the plaintiff saying, This is what I

10:42  23   think the plain meaning of this limitation is, and this

10:43  24   is the evidence I'm pointing you to, Judge, where a

10:43  25   reasonable jury could find that the temperature of the

10:43   1   fluid in the tank is part of the -- is adapted to

10:43   2   control both of these variables.

10:43   3                We've never heard that.

10:43   4                We've heard them saying that I'm asking

10:43   5   you to give an overly narrow claim construction.  I'm

10:43   6   not.  But they need to be doing something.  If they're

10:43   7   not measuring it with a sensor in the tank, they need

10:43   8   to be explaining what evidence there is that we do

10:43   9   anything like using that temperature of the fluid in

10:43   10  the tank to coordinate the operation -- to be adapted

10:43   11  to coordinate the operation of two different control

10:43   12  facilities.

10:43   13               And I didn't hear counsel give an

10:43   14  explanation of what that limitation means or what

10:43   15  evidence satisfies it.

10:43   16               With respect to Prime Controls -- and

10:43   17  this applies to Prime Controls and the Kelvion coolers

10:43   18  where they were going to install sensors but never did.

10:43   19  The most -- this is where we heard counsel try to point

10:43   20  to evidence, but he points to some unidentified

10:44   21  deposition testimony that I'm not sure was even in the

10:44   22  opposition brief, and is from several years ago, I

10:44   23  believe, saying that at one point Rhodium planned to

10:44   24  have Prime Controls finish its work.

10:44   25               That is of no moment now.

10:44  1          If we're going to have a trial now, we

10:44  2    can't have an advisory opinion about a system that

10:44  3    isn't in place.  And that would -- even if we could,

10:44  4    that would be an enormous waste of resources.  We need

10:44  5    to have a trial over the system as it exists now.  And

10:44  6    Mr. Kolegraff is not pointing to any evidence that all

10:44  7    Rhodium needs to do is turn on the switch.  The

10:44  8    evidence is to the contrary.

10:44  9          Their own evidence that they cite to this

10:44  10   Court is that none of the sensors is wired in.  Their

10:44  11   expert concedes that the system is incapable of

10:44  12   measuring temperature.  We really ought not to have a

10:44  13   trial over Prime Controls and Kelvion, which may never

10:44  14   be finished, may be changed.  It's not the province of

10:45  15   federal courts to have a trial over something that

10:45  16   might happen with a system in the future.

10:45  17          There also is no evidence of how these

10:45  18   sensors, which are nowhere near the tank containing the

10:45  19   bitcoin miners, if they were operational, would be used

10:45  20   to coordinate the operation of both the fans and the

10:45  21   coolers.  That's what they say they would do, but how

10:45  22   would that be adapted to coordinate the operation of

10:45  23   what they say counts as the primary circulation

10:45  24   facility, the pumps and the pipes?

10:45  25          We didn't hear that.  We won't hear that,

—49—

| | |
|---|---|
| 10:45 | 1 |

from them or their expert, because they have no

evidence of that.  And they haven't tried to point Your

Honor to that evidence now.

The third point I'd like to make is about

Guntner.  Mr. Kolegraff misstated the record.  I will

show -- this is their opposition brief, Docket 164.

Near the end, I think we're at Page 21.  Yeah.

Page 21.

The Guntner coolers -- which he

acknowledges are outside the building -- the

temperature sensors there sense the temperature -- I'm

quoting from their brief -- sense the temperature of

the dielectric fluid flowing out of the evaporative

cooler.

The job of that cooler is to cool.  So

it's obviously not the same as the temperature of the

liquid when it's in the tank with the miners.  And

their expert concedes as much, and they have completely

abandoned any effort to explain how it's

insubstantially different or how, under the doctrine of

equivalents, this theory could survive.

And the second thing about Guntner, all

they say at that page of their brief is that the sensor

there in that Guntner cooler is adapted to adjust the

cooler's fan speed.  Okay.  So they have evidence to

| | | |
|---|---|---|
| 10:47 | 1 | get to the jury on one of the two circulation |
| 10:47 | 2 | facilities that they need. |
| 10:47 | 3 | But we didn't even hear Mr. Kolegraff |
| 10:47 | 4 | point to any evidence about coordination of the primary |
| 10:47 | 5 | facility, the pumps and the pipes, because Guntner, |
| 10:47 | 6 | there is no evidence from which a reasonable juror |
| 10:47 | 7 | could conclude that this claim limitation is satisfied. |
| 10:47 | 8 | And finally, on Restful API, I will say, |
| 10:47 | 9 | we heard attorney argument, but all they're really |
| 10:47 | 10 | saying is that Rhodium can monitor the temperature of |
| 10:47 | 11 | the chips.  They're not pointing to any evidence that |
| 10:47 | 12 | the chip temperature or the PCB board temperature is |
| 10:47 | 13 | actually adapted to coordinate the operation of |
| 10:47 | 14 | anything that they've pointed to as the primary or |
| 10:47 | 15 | secondary circulation facilities. |
| 10:47 | 16 | And to -- just to conclude, at minimum, |
| 10:47 | 17 | Your Honor, I hope we have at least made the case |
| 10:47 | 18 | narrower on doctrine of equivalents, because they did |
| 10:47 | 19 | not -- they can't save that by just saying, Oh, but we |
| 10:47 | 20 | attached our expert report. |
| 10:48 | 21 | Well, our brief went through the expert |
| 10:48 | 22 | report and explained why what the expert said couldn't |
| 10:48 | 23 | count -- wasn't enough to get to a jury on doctrine of |
| 10:48 | 24 | equivalents.  And they made no attempt to defend that, |
| 10:48 | 25 | and they shouldn't get to revive it now. |

10:48  1                    MR. KOLEGRAFF:  Your Honor?

10:48  2                    THE COURT:  Yes, sir.

10:48  3                    MR. KOLEGRAFF:  May I address those

10:48  4     points or...

10:48  5                    Yes.  So you asked if we ever described

10:48  6     where we get our plain meaning that the temperature

10:48  7     probe does not have to be in the tank.  I don't want to

10:48  8     repeat myself, but yes.  We did have evidence that

10:48  9     we've shown the Court today.

10:48  10                   For example, Figure 4 and Figure 12 of

10:48  11    the patent shows that the sensors don't have to be in

10:48  12    the tank.  Figure 13 actually shows that you could have

10:48  13    the sensors on the fluid lines and the reservoir.  You

10:48  14    could have it on the -- on the coolant lines.  You

10:48  15    could have it in the primary.  You could have it in the

      16    secondary.

10:48  17                   You can put that -- those temperature

10:48  18    probes wherever you want them and still control the

10:48  19    primary and secondary circulation of those.

10:48  20                   Something we have to understand when we

10:49  21    look at the Rhodium system, because we're talking about

10:49  22    primary versus secondary, here the primary is the

10:49  23    portion of the system that takes the fluid and flows it

10:49  24    through the tank, which extracts heat from the miner.

10:49  25    The secondary's what happens out at the coolers, where

10:49  1    you take that fluid and cool it through the evaporative

10:49  2    cooler.

10:49  3               So where do we have to measure?  This is

10:49  4    our Point No. 2.

10:49  5               So she's saying we haven't talked about

10:49  6    where we actually take the measurements.  Well, if

10:49  7    you're talking about Prime Controls, they take the

10:49  8    measurements all over the place.

10:49  9               Their system has no noninfringing

10:49  10   functionality.  It is adapted to take the temperatures

10:49  11   and control the fans.

10:49  12              True.  At this exact moment in time the

10:49  13   wires haven't been hooked up, but we have evidence, we

10:49  14   have the e-mail that says they are planning to hook

10:49  15   these things up when they get the chance.

10:49  16              So they are going to use this system at

10:49  17   some point.  It's just not believable that you're going

10:49  18   to have millions of dollars worth of control equipment

10:49  19   sitting there, all of these computers, a room full of

10:49  20   computers meant to control this facility, and you're

10:50  21   not going to turn it on.

10:50  22              So again, the same thing with the Prime

10:50  23   Control and the Kelvion.  Even though it can't measure

10:50  24   today, it certainly is adapted to.

10:50  25              Now, again, Ms. Brannen said that I

10:50  1    misquoted how the Guntner works.  I thought I got that
10:50  2    right, because I do understand that what's flowing --
10:50  3    what we are measuring is the output of the Guntner
10:50  4    cooler.  That is true.
10:50  5             And that -- and I think I pointed out
10:50  6    that the output of the Guntner cooler is actually the
10:50  7    input to the tank.
10:50  8             So we are measuring the fluid temperature
10:50  9    of the temperature in the tank.  It's just we're
10:50  10   measuring that at the input line rather than the output
10:50  11   line.
10:50  12            So she asked:  How is that coordinating
10:50  13   primary and secondary?
10:50  14            Well, you have the fans on the Guntner
10:50  15   cooler, which are adjusting to keep that output at a
10:50  16   certain temperature or temperature range to make sure
10:50  17   the miners are being cooled.  That is affecting the
10:51  18   temperature of the fluid as it flows through the
10:51  19   primary system and through the secondary system.
10:51  20            We are coordinating the control of the
10:51  21   facilities by using the output temperature from that
10:51  22   Guntner cooler.
10:51  23            As far as the Restful API, I think we've
10:51  24   shown pretty strongly in the expert report that we are
10:51  25   measuring at a temperature of the fluid using the PCB

| | | |
|---|---|---|
| 10:51 | 1 | inside the miner itself, and then that is used to reset |
| 10:51 | 2 | the miner to either increase power if it can be run |
| 10:51 | 3 | warmer or decrease power if you need it to run cooler. |
| 10:51 | 4 | So I think we've shown this in all of it. |
| 10:51 | 5 | Again, there's a -- plenty of genuine issues of fact |
| 10:51 | 6 | here for denying this motion. |
| 10:51 | 7 | THE COURT:  I'll be back in a few |
| 10:51 | 8 | seconds. |
| 10:51 | 9 | (Pause in proceedings.) |
| 10:54 | 10 | THE COURT:  The Court is going to grant |
| 10:55 | 11 | the motion for summary judgment of noninfringement.  I |
| 10:55 | 12 | think that fully takes care of the case for the time |
| 10:55 | 13 | being. |
| 10:55 | 14 | I'm not going to take up the motions in |
| 10:55 | 15 | limine given my ruling on that motion, which I think |
| 10:55 | 16 | obviates the need for a trial at this time. |
| 10:55 | 17 | Is there anything else we need to take up |
| 10:55 | 18 | today? |
| 10:55 | 19 | MR. KOLEGRAFF:  Your Honor, would we be |
| 10:55 | 20 | able to readdress this -- after we get Pokharna's |
| 10:55 | 21 | report redone, would we be able to readdress this issue |
| 10:55 | 22 | on the motion for summary judgment? |
| 10:55 | 23 | THE COURT:  Well, you know, you have -- |
| 10:55 | 24 | you've had your chance, but obviously, it's a fairly |
| 10:55 | 25 | severe ruling.  Let me talk to my clerks and see if |

| | | |
|---|---|---|
| 10:55 | 1 | they think anything additional that an expert would say |
| 10:56 | 2 | might benefit us.  And if it is, we'll let you know. |
| 10:56 | 3 | As of right now, I don't think it would. |
| 10:56 | 4 | So anything besides that? |
| 10:56 | 5 | MR. SMITH:  Your Honor, if I could ask |
| 10:56 | 6 | one more question about the Court's ruling. |
| 10:56 | 7 | There's been a fair amount of argument |
| 10:56 | 8 | today about how the systems are today versus after how |
| 10:56 | 9 | the systems are turned on or wired or whatever. |
| 10:56 | 10 | So I think we'd want to confirm the scope |
| 10:56 | 11 | of the Court's ruling so we would know whether a claim |
| 10:56 | 12 | against the facilities, once they're put into |
| 10:56 | 13 | operation, would be affected by the Court's ruling |
| 10:56 | 14 | today, or would that be a different set of facts? |
| 10:56 | 15 | THE COURT:  That would be a different set |
| 10:56 | 16 | of facts.  I don't know -- |
| 10:56 | 17 | MR. SMITH:  Thank you, Your Honor. |
| 10:56 | 18 | THE COURT:  Yeah.  I don't know that it |
| 10:56 | 19 | would change the ruling ultimately, but, you know, that |
| 10:56 | 20 | clearly is an issue in this case. |
| 10:56 | 21 | MR. SMITH:  Okay.  Thank you, Your Honor. |
| 10:56 | 22 | THE COURT:  Okay.  Have a good day.  Take |
| 10:56 | 23 | care. |
| 10:56 | 24 | (Hearing adjourned.) |
| | 25 | |

1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS      )

3

4

5              I, Kristie M. Davis, Official Court

6    Reporter for the United States District Court, Western

7    District of Texas, do certify that the foregoing is a

8    correct transcript from the record of proceedings in

9    the above-entitled matter.

10             I certify that the transcript fees and

11   format comply with those prescribed by the Court and

12   Judicial Conference of the United States.

13             Certified to by me this 11th day of April

14   2024.

15

16                    /s/ Kristie M. Davis
                      KRISTIE M. DAVIS
17                    Official Court Reporter
                      800 Franklin Avenue
18                    Waco, Texas 76701
                      (254) 340-6114
19                    kmdaviscsr@yahoo.com

20

21

22

23

24

25

10:56